580 F.2d 642
 188 U.S.App.D.C. 379
 AUSTASIA INTERMODAL LINES, LTD. d/b/a Austasia Container
Express, et al., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
U.S. Atlantic and Gulf/Australia-New Zealand Conference, Intervenor.
 No. 77-1236.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 28, 1978.
Decided May 4, 1978.
 
 Darrell L. Jones, Washington, D.C., for petitioners.
 C. Jonathan Benner, Atty., Federal Maritime Commission, Washington, D.C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Barry Grossman, and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 Also, Carl D. Lawson, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent.
 David C. Jordan, Washington, D.C., with whom Stanley O. Sher, Washington, D.C., was on the brief, for intervenor.
 Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.
 Opinion for the court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 Petitioners seek review of the holding of the Federal Maritime Commission (Commission) that Austasia Intermodal Lines, Ltd., d/b/a Austasia Container Express (ACE), is a common carrier by water in the foreign commerce of the United States within the meaning of section 1 of the Shipping Act of 1916, as amended,[1] and is therefore subject to the tariff filing requirements of section 18(b) of that Act[2] and section 536.16(b) of the Commission's rules.[3] For the reasons stated below, we reverse the Commission's holding and vacate its order requiring ACE and any of its affiliates operating as Austasia Container Express[4] to file tariffs reflecting the rates charged for their through transportation between Detroit, Michigan, and ports in Australia.
 
 
 2
 * Since June 1972, either ACE or its affiliate American Container Express (American) has advertised and offered to United States shippers and freight forwarders through, common carrier service from Detroit, Michigan, to various ports in Australia. Cargo is received at freight consolidating stations in the Detroit commercial zone, where it is placed in leased containers to be shipped by truck to Windsor, Ontario, Canada. At Windsor, the containers are loaded onto Canadian Pacific Railway trains for transportation across Canada by rail to Vancouver, British Columbia. Once in Vancouver, the cargo is placed aboard Russian or Japanese ocean carriers for shipment to Australia via Japan.[5] Neither ACE nor American has any joint arrangement with any of the underlying carriers actually transporting the goods, other than as a regular shipper making use of the carriers' services.[6]
 
 
 3
 A single bill of lading is issued for the entire transportation service of ACE and American when the containers are loaded onto the ocean vessels in Vancouver, and a single charge is levied for the total through shipment.[7] There is at present no tariff on file with the Commission for the freight transportation formerly provided by ACE and now operated by American.[8]
 
 
 4
 In October 1973, the Commission issued an Order of Investigation to determine whether ACE was a common carrier by water in the foreign commerce of the United States within the meaning of section 1 of the Shipping Act, and, if so, whether it was required to file a tariff with the Commission, pursuant to section 18(b) of the Act and section 536.16(b) of the Commission's rules, for its Detroit-to-Australia operation.[9] The hearing examiner, after evidentiary hearings, found that ACE was a "novel type of non-equipment operating intermodal carrier" which was not embraced by section 1 of the Shipping Act because its service did not involve vessels calling at United States ports.[10] In a report issued February 7, 1977, the Commission reversed this Initial Decision, holding that ACE was a common carrier by water in foreign commerce and ordering ACE and its affiliates to cease their Detroit-to-Australia shipments until a tariff was filed with the Commission for the through service.[11] Petitioners ACE and American now seek review of the Commission's order.
 
 II
 
 5
 Section 1 of the Shipping Act of 1916, as amended, defines a "common carrier by water in foreign commerce" as a "common carrier . . . engaged in the transportation by water of passengers or property between the United States or any of its Districts, Territories, or possessions and a foreign country, whether in the import or export trade . . . ."[12] Both section 18(b) of the Shipping Act[13] and section 536.16(b) of the Commission's rules[14] use the term "common carrier by water in foreign commerce" to define the scope of their tariff filing requirements; therefore, the limits of the Commission's jurisdiction to regulate carriers under these sections must necessarily depend upon the meaning and interpretation of the section 1 definition.
 
 
 6
 As stated earlier, the Commission held that, although ACE's and American's services did not include the use of vessels calling at United States ports, they were nonetheless included within the ambit of the Commission's jurisdiction to require the filing of tariffs. We recognize that we must give due deference to statutory interpretation by an agency whose duty it is to implement and administer the statute in question. NLRB v. Hearst Publications, Inc., 322 U.S. 111, 130-31, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); See North Atlantic Westbound Freight Association v. FMC, 130 U.S.App.D.C. 122, 124, 397 F.2d 683, 685 (1968). Ultimately, however, statutory construction is a judicial function, FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); Accord, Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), and, in this case, we believe that the Commission was incorrect in holding that ACE and American fall within the section 1 definition of common carrier by water in foreign commerce.
 
 
 7
 A simple reading of section 1 supports our view. According to the statute, a common carrier by water in foreign commerce is one that transports people or cargo By water between the United States and a foreign country; thus, by clear implication, a United States port is required somewhere along the route. ACE and American, however, do not make use of United States ports at any point in their service, but instead ship property overland out of the United States and thereafter exclusively between foreign ports.
 
 
 8
 Although we believe section 1 to be clear on its face, we have nevertheless reviewed the legislative history, court decisions, and Commission cases relied upon by the parties for possible further illumination of the statutory definition. The legislative history of the Shipping Act casts little light on the issue presented in this case. The Alexander Committee Report,[15] which laid the foundation for the Shipping Act, is a comprehensive examination of the practices and problems of the shipping industry as it existed in 1913, but does not deal specifically with the exact limits on the power to be entrusted to the agency regulating that industry. The testimony at the 1916 House hearings on the contemplated shipping legislation does indicate that transportation services touching only foreign ports, including Vancouver, were not intended to fall within the purview of the Shipping Act.[16] Such testimony should not be accorded undue weight as an indication of legislative intent, however, since the views expressed by witnesses at congressional hearings are not necessarily the same as those of the legislators ultimately voting on the bill. McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493-94, 51 S.Ct. 510, 75 L.Ed. 1183 (1931); See March v. United States, 165 U.S.App.D.C. 267, 275, 506 F.2d 1306, 1314 & n. 30 (1974).
 
 
 9
 The judicial decisions primarily relied upon by the petitioners and also cited in the Initial Decision[17] likewise provide little guidance in deciding the question presented in this case, because, as the Commission correctly points out,[18] they deal with fundamentally different factual situations. In those cases, the issue was whether the contracts or agreements of foreign-flag ship companies fell within the ambit of the Shipping Act because the companies made use of American ports in their operations. Thus, the decisions in those cases, while supporting the proposition that foreign ships that Do call at United States ports are subject to American law, are not relevant to the different issue of whether companies transporting cargo out of the United States, but Not using American ports to do so, are also subject to the Commission's jurisdiction under section 1.
 
 
 10
 The Commission's own decisions interpreting the scope of section 1 are similarly inconclusive as to the applicability of that section to ACE and American. In Pacific Seafarers, Inc. v. Atlantic & Gulf American-Flag Berth Operators, 8 F.M.C. 461, 465 (1965), a case upon which petitioners rely, the Commission indeed stated that a carrier's service must include a trade terminus at a United States port in order for that carrier to be "engaged in the foreign commerce of the United States". The American-flag ship organization under scrutiny in that case, however, had absolutely no connection with United States cargo and did not perform a through service beginning in the United States for subsequent shipment out of a foreign port.
 
 
 11
 The cases upon which the Commission relies are also inapposite. In Disposition of Container Marine Lines Through Intermodal Container Freight Tariffs Nos. 1 & 2, FMC Nos. 10 & 11, 11 F.M.C. 476, 483 (1968), the Commission held that the tariff filing requirements of section 18(b) of the Shipping Act encompassed both the inland and the ocean portions of the routes of a carrier subject to Commission regulation. Unlike ACE and American, the carrier in Container Marine Lines did in fact enter a United States port on its route and was therefore unquestionably included in the section 1 definition of common carrier by water in foreign commerce, at least as to the ocean portion of its service.
 
 
 12
 In Transshipment & Apportionment Agreements from Indonesian Ports to U.S. Atlantic & Gulf Ports, 10 F.M.C. 183, 191 (1966), the Commission interpreted section 1 as including both carriers in an operation in which one carrier originated cargo in Indonesia and then transshipped it to another carrier calling at a United States port, the entire service being provided on a through bill of lading. While it is true that the originating carrier in that case did not call at an American port, the continuous contractual transshipment did involve a port in the United States as an integral part of the through service. See Transshipment & Through Billing Arrangement Between East Coast Ports of South Thailand & United States Atlantic & Gulf Ports, 10 F.M.C. 201, 207-14 (1966).
 
 
 13
 As stated earlier, the tariff filing requirements of both section 18(b) of the Shipping Act and section 536.16(b) of the Commission's rules apply only to common carriers by water in foreign commerce, as defined in section 1 of the Shipping Act. Section 18(b) was incorporated into the Shipping Act in 1961[19] and provides for the filing of tariffs with the Commission to show charges for transportation "to and from United States ports and foreign ports between all points on (the carrier's) own route and on any through route which has been established." Although the intervenor in this case contends that the portion of the statutory section pertaining to through rates should be read alone, without reference to the phrase concerning United States and foreign ports,[20] such a reading seems to be merely an attempt to stretch the statute beyond its plain meaning in order to include the operations of ACE and American. Furthermore, the legislative history of the 1961 amendment shows that Congress did not intend to expand the Commission's jurisdiction to include any services strictly between foreign ports. H.R.Rep. No. 498, 87th Cong., 1st Sess. 21 (1961); See S.Rep. No. 860, 87th Cong., 1st Sess. 19 (1961). Thus, we can find no indication in either the 1961 amendment or its legislative history that Congress intended to alter the original scope of the section 1 definition of common carrier by water in foreign commerce.
 
 
 14
 Likewise, section 536.16(b) of the Commission's rules cannot be read as extending tariff filing requirements to reach ACE and American unless they are already included within the Commission's jurisdiction by reason of section 1 of the Shipping Act. Section 536.16(b) literally applies to all through transportation of freight between ports Or points in the United States and ports or points in a foreign country and thus would seem to apply to the operations of ACE and American. The Commission, however, cannot expand by its own regulations the power given to it by Congress, and the statutory definition of common carrier by water in foreign commerce remains as a circumscription on the operation of section 536.16(b).
 
 
 15
 In the final analysis, then, in order to resolve the issue presented in this case, we are left with a pure question of statutory interpretation of the definition of common carrier by water in foreign commerce, as it appears in section 1 of the Shipping Act. As stated earlier, we agree with the hearing examiner that the definition clearly requires that a carrier make use of a United States port at some point on its own route or a through route in which it participates. Therefore, because ACE and American ship by land rather than by water out of the United States and then transport cargo solely between foreign ports, we do not believe that they fall within the statutory definition on which the Commission's power to require tariff filing is based.
 
 III
 
 16
 In reversing the Commission's decision in this case, we are not unmindful of the remedial purposes of the Shipping Act to prevent discrimination in the shipping industry and to promote healthy competition among carriers. Perhaps companies which operate the type of service provided by ACE and American should be required to file tariffs reflecting the transportation rates they charge. It is not, however, the prerogative of a court or an administrative agency to expand the scope of legislation beyond what was originally intended by Congress. Under section 1 of the Shipping Act as it now reads, and therefore under section 18(b) of that Act and section 536.16(b) of the Commission's rules, the Federal Maritime Commission has exceeded its jurisdiction by requiring ACE and American to file tariffs for their intermodal transportation service between Detroit and Australia.
 
 
 17
 Reversed.
 
 
 
 [1]
 46 U.S.C. §§ 801-842 (1970 & Supp. V 1975)
 
 
 [2]
 Id. § 817(b) (1970)
 
 
 [3]
 46 C.F.R. § 536.16(b) (1976)
 
 
 [4]
 At the time of the Commission hearings, Austasia Intermodal Lines, Ltd., d/b/a Austasia Container Express (ACE), offered the through shipping service from Detroit to Australia which was the subject of the administrative proceeding. In 1976, American Container Express, Inc., d/b/a Austasia Container Express, an affiliate of ACE, took over the operations in question, but the service provided is the same in all respects relevant to our disposition of this case. See Appendix (App.) at 76-79; Brief for Petitioners at 6-7
 
 
 [5]
 See App. at 66-67
 
 
 [6]
 Brief for Petitioners at 8
 
 
 [7]
 App. at 73-74, 85
 
 
 [8]
 See id. at 70-72
 
 
 [9]
 See id. at 1, 4
 
 
 [10]
 Id. at 16, 35
 
 
 [11]
 Id. at 61
 
 
 [12]
 46 U.S.C. § 801 (1970)
 
 
 [13]
 46 U.S.C. § 817(b)(1) (1970) provides, in pertinent part, as follows (emphasis added):
 (E)very common carrier by water in foreign commerce and every conference of such carriers shall file with the Commission and keep open to public inspection tariffs showing all the rates and charges of such carrier or conference of carriers for transportation to and from United States ports and foreign ports between all points on its own route and on any through route which has been established.
 
 
 [14]
 46 C.F.R. § 536.16(b) (1976) provides, in pertinent part, as follows (emphasis added):
 Every common carrier by water in the foreign commerce of the United States, as defined in the Shipping Act, 1916, or conference of such carriers, shall file with the Commission tariffs of any through rates, charges, rules, and regulations governing the through transportation of freight between ports or points in the United States and ports or points in a foreign country in which such carrier or conference participates.
 
 
 [15]
 H.R.Doc. No. 805, 63d Cong., 2d Sess. (1914)
 
 
 [16]
 Hearings on H.R. 14337 before the House Comm. on the Merchant Marine & Fisheries, 64th Cong., 1st Sess. 32-33, 55-57 (1916); App. at 43-44
 
 
 [17]
 See Armement Deppe, S. A., v. United States, 399 F.2d 794 (5th Cir. 1968), Cert. denied, 393 U.S. 1094, 89 S.Ct. 870, 21 L.Ed.2d 785 (1969); Compagnie Generale Transatlantique v. American Tobacco Co., 31 F.2d 663 (2d Cir.), Cert. denied, 280 U.S. 555, 50 S.Ct. 16, 74 L.Ed. 611 (1929)
 
 
 [18]
 Brief for Respondents Federal Maritime Commission and United States of America at 7-8
 
 
 [19]
 Act of Oct. 3, 1961, Pub.L. No. 87-346, 75 Stat. 762, 764-65
 
 
 [20]
 Brief for Intervenor U.S. Atlantic & Gulf/Australia-New Zealand Conference at 26-28