**NEPERA CHEMICAL, INC., Petitioner,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents.**

**No. 79–2186.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1980.

Decided Aug. 6, 1981.

---

Petition for Review of an Order of the Federal Maritime Commission.

Martin Sterenbuch, Washington, D. C., for petitioner.

Clare R. Donelan, Atty., Federal Maritime Commission, ·Washington, D. C., for respondent. Edward G. Gruis and Bruce Love, Attys., Federal Maritime Commission, Washington, D. C., were on the, brief for respondents.

John J. Powers, III, Robert J. Wiggers and Stanford M. Litvack, Washington, D. C., also entered appearances for respondent United States.

Before ROBB and WILKEY, Circuit Judges, and GESELL,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This case concerns the application by a carrier, Sea-Land Service, Inc., for waiver of a total of $42,569.90 in freight charges for the benefit of a shipper, Nepera Chemical, Inc.[1] The Federal Maritime Commission denied the application. *FMC Special Docket No. 606 (1979).* We reverse.

During 1977 Nepera contracted to have Sea-Land transport five containers of picoline (a liquid chemical) from the United States to Barcelona, Spain. At the time of the agreement, Sea-Land's Freight Tariff 166[2] contained a specific rate for picoline transport which made total charges of $13,700 appropriate for the Nepera shipment.[3] Effective December 31, 1977 Sea-Land cancelled Tariff 166 and instituted Tariff 232, but neglected to specify a commodity rate

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Sea-Land also seeks permission to refund $280.25 to Nepera. (ALJ Decision, J.A. at 28) Because this amount represents the paid portion of the $42,569.90 overcharge for which waiver is sought, the refund request does not raise a separate issue.

2. All United States common carriers in interstate and foreign commerce are required to publish and file with the FMC their rates, charges, classifications, and tariffs. (Section 18, Shipping Act of 1916, as amended, 46 U.S.C. § 817(a)(b) (1975)). Charges for shipments must be based upon tariff rates on file

with the FMC at the time of shipment unless the Commission, in its discretion, permits otherwise. 46 U.S.C. § 817(b)(3).

3. Tariff 166 contained commodity rates for shipments from U.S. North Atlantic ports to ports in Spain. This tariff provided a rate for carriage of picolines, specifically named, of $6.85 per cwt (hundred pounds), minimum 40,000 pounds per container. (Tariff No. 166, Item 9140; J.A. at 5). The Nepera shipments consisted of five containers. (ALJ Decision, J.A. at 26) A charge of $13,700 is derived by multiplying: 5 containers × 40,000 pounds per container × $6.85 per pound. (Br. of Nepera at 7, n.4)

for picoline transport.[4] As a result, when the ship Galloway left port in June 1978 with the picoline cargo, Sea-Land was obligated to charge Nepera the Cargo N.O.S. (not otherwise specified) rate for nonhazardous liquids, which produced total freight charges of $56,361.15.[5] These charges were more than 300 percent above the original rate.

It was the clearly documented understanding of Sea-Land and Nepera that the original rate for picoline transport would apply to the shipment and be carried forward in Tariff 232. On November 30, 1977 Sea-Land's Sales Division sent instructions to its Pricing Department to "assure that [the Tariff 166 picoline] rate [was] protected and converted to the new # 232 tariff" when it was published. (J.A. at 7–8) The

Sales Division then notified Nepera that the picoline rate would be extended to Tariff 232. (J.A. at 9)

Ten days after shipment Sea-Land sought to rectify its oversight by publishing the Tariff 166 rate for picoline in Tariff 232.[6] Because the two tariffs employed different weight measures (hundred pounds and tons, respectively), conversion computations involving some "rounding off" were required. The resulting charges for the Nepera shipment under Tariff 232 were $13,791.25. Nepera was content to accept this minor increase of $91.25 in the original freight charges given the alternative overcharge of $42,661.15 under the Cargo N.O.S. rate.[7]

Pursuant to the procedure established by section 18(b)(3) of the Shipping Act of 1916, as amended, 46 U.S.C. § 817(b)(3)[8] Sea-

---

**4.** The new tariff was necessitated by the entrance of Sea-Land into the U.S. North Atlantic/Spanish Freight Agreement 10017 on December 31, 1977. This Agreement requires that rates be standardized according to a WT (ton) rather than cwt formula. (Exceptions to Initial Decision, J.A. at 38–39) Tariff 232 was the product of converting Tariff 166 rates from the cwt to WT standard, with one WT equal to 2240 pounds. *Id.*

**5.** Tariff 232 provides for a Cargo N.O.S. rate for liquid (non-hazardous) of $631.25 per ton, minimum 40,000 pounds per container. (Tariff No. 232, Item 10, 12th Rev., J.A. at 12) A total charge of $56,361.16 was derived by multiplying: 5 containers × 40,000 pounds per container ÷ WT × $631.25 per WT. (ALJ Decision, J.A. at 27; Br. of Nepera at 7)

**6.** The Tariff 232 rate for picoline, filed on June 21, 1978, is $162.25 per WT, minimum 17 WT per container. (Tariff No. 232, Item 78, 6th Rev.; J.A. at 13).

**7.** An examination of the rate conversion process demonstrates that the slight variance between the original and new freight charges does not reflect a failure to file the intended rate. The Tariff 166 picoline rate of $6.85 per cwt., 40,000 pounds container minimum was converted to the Tariff 232 WT formula, with one WT (ton) equal to 2240 pounds. Because the loadability of picoline is 38,000 pounds per container (40,000 pounds less a 2000 pound (5%) standard safety margin), Sea-Land rounded up the actual container minimum by 80 pounds to equate to 17 WT per container (17 WT times 2240 pounds per WT equals 38,080 pounds). This conversion of the 40,000 pound minimum to 17 WT equated to a fractional

differential of .0004792 cents per pound or .0066 percent. In economic terms the difference created an increase of $18.25 per container under Tariff 232. The rounding off involved in the conversion thus reflected the loadability of the commodity and the need to comport with a WT standard. (Exceptions, J.A. at 39–40) Sea-Land now seeks to waive an overcharge of $42,569.90, i. e., the difference between the Cargo N.O.S. charge ($56,361.15) and the Tariff 232 charge ($13,791.25).

**8.** Section 18(b)(3) of the Shipping Act of 1916, as amended, 46 U.S.C. § 817(b)(3) states in pertinent part:

(3) ... [T]he Federal Maritime Commission may in its discretion and for good cause shown permit a common carrier by water in foreign commerce or conference of such carriers to refund a portion of freight charges collected from a shipper or waive the collection of a portion of the charges from a shipper where it appears that there is an error in a tariff of a clerical or administrative nature or an error due to inadvertence in failing to file a new tariff and that such refund or waiver will not result in discrimination among shippers: *Provided further*, That the common carrier by water in foreign commerce or conference of such carriers has, prior to applying for authority to make refund, filed a new tariff with the Federal Maritime Commission which sets forth the rate on which such refund or waiver would be based; *Provided further*: That the carrier or conference agrees that if permission is granted by the Federal Maritime Commission, an appropriate notice will be published in the tariff, or such other steps taken as the Federal Mari-

Land filed an application with the FMC for permission to waive and refund the excess of the Cargo N.O.S. charges over the Tariff 232 charges ($42,569.90). (J.A. at 1) The Administrative Law Judge denied the application on the ground that the slight difference in rates under the two tariffs constituted a "fatal [jurisdictional] defect". (ALJ Decision, J.A. at 32) Sea-Land filed exceptions to the decision which demonstrated that the charge differential was due solely to "rounding off" in the conversion process and that the Tariff 232 rate accurately reflected the original agreement between shipper and carrier. (Exceptions, J.A. at 39–40) On appeal the FMC affirmed the ALJ's Decision. (FMC Decision, J.A. at 43–45)

The Shipping Act of 1916, as amended, 46 U.S.C. § 801 *et seq.*, provided in section 18(b)(3) for the waiver and refund of charges by a carrier "where it appears that there is an error in a tariff of a clerical or administrative nature or an error due to inadvertence in failing to file a new tariff .... " 46 U.S.C. § 817(b)(3). Four requirements must be met by the carrier as a prerequisite to FMC approval: (1) it must be shown that the waiver and refund will not result in discrimination among shippers; (2) the corrected tariff upon which relief will be based must be filed; (3) notice of the corrected tariff must be given to all affected shippers; and (4) the application for waiver and refund must be filed with the FMC within 180 days after shipment. *Id.* The FMC held that Sea-Land failed to fulfill the second jurisdictional requirement, because the "rate negotiated between Sea-Land and Nepera and the rate filed by Sea-Land pursuant to its application are clearly at variance." (FMC Decision, J.A. at 44)

Section 18(b)(3) requires, in relevant part:

> time Commission may require, which give notice of the rate on which such refund or waiver would be based, and additional refunds or waivers as appropriate shall be made with respect to other shipments in the manner prescribed by the Commission in its order approving the application: *And provided further*, That application for refund or waiver must be filed with the Commission

That the common carrier by water in foreign commerce or conference of such carriers has, prior to applying for authority to make refund, filed a new tariff with the Federal Maritime Commission which sets forth *the rate on which such refund or waiver would be based....*

46 U.S.C. § 817(b)(3) [Emphasis supplied]. The new tariff, in short, must reflect the rate which was intended to be applicable by both shipper and carrier. Nepera maintains that the rate filed by Sea-Land pursuant to the above requirement accurately reflects the parties' original agreement and that the charge differential is attributable solely to the conversion from a cwt (hundred pounds) to a WT (ton) weight measure.[9] The FMC interpreted section 18(b)(3) strictly to require the filing of the exact promised rate without any allowance for minor mathematical variation. (FMC Decision, J.A. at 45) We disagree. "The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose." *United States v. Brown*, 333 U.S. 18, 25, 68 S.Ct. 376, 379, 92 L.Ed. 442 (1948).

Due deference should be accorded statutory interpretation by an agency which has the responsibility for implementing and administering the statute. "Ultimately, however, statutory construction is a judicial function.... " *Austasia Intermodal Lines, Ltd. v. FMC*, 188 U.S.App.D.C. 379, 381, 580 F.2d 642, 644 (1978).

The relevant language of section 18(b)(3) —"the rate on which such refund or waiver would be based"—says nothing regarding exactitude. The legislative history of this section is similarly silent on the issue of whether the intended and filed rates need

> within one hundred and eighty days from the date of shipment.
>
> [Emphasis in original]

9. *See* note 7 *supra*. The ALJ, in discussing the computations (J.A. at 33–34), addressed only the fact of mathematical variance. He failed to explore the legitimate reasons for the rounding off which caused the minor difference in charges. (See J.A. at 39–40)

be precisely equivalent.[10] The drafters of this provision, it would appear, did not contemplate the situation before us: the filing of a promised rate which because of a change in the method of computation varies slightly from the intended rate and which is accepted by both parties as an adequate representation of their understanding.

We turn for guidance to the purposes of section 18(b)(3), for "[t]here is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed. . . ." *FDIC v. Tremaine*, 133 F.2d 827, 830 (2d Cir. 1943). As the FMC concedes, the overriding purpose of this section is unquestionably remedial. (Br. of FMC at 7) First, the statute is intended to remedy carrier tariff errors which have adverse economic effects on shippers: "shippers . . . should not be made to bear the consequences of a carrier's bona fide neglect or omission." House Hearings, *supra*, n.10 at 85 (Statement of FMC Chairman Harllee). Second, if a tariff error is corrected equal treatment of all shippers is required. Proof of the prior tariff agreement as well as publication of the new rate assure that the refund and waiver remedy will not result in rate discrimination or rebate. 46 U.S.C. § 817(b)(3); S.Rep.No.1078, 90th Cong., 2d Sess. 2 (1968); H.R.Rep.No.920, 90th Cong.,

1st Sess. 2–3 (1967), U.S.Code Cong. & Admin.News 1968, p. 1911.[11]

The two remedial purposes of section 18(b)(3)—relief of shippers from the burdens of carrier negligence and the prevention of rate discrimination and rebates—are not furthered by the FMC Decision. The Commission's construction of the statute forces the shipper to bear a $42,569.90 overcharge which is due solely to Sea-Land's negligence in failing to carry forward the picoline rate. Because the Tariff 232 rate results in a minor overcharge of $91.25 to Nepera, it is certain that no rate discrimination or rebate in favor of Nepera was either intended or possible.

The reliance by FMC on *Munoz Y Cabrero v. Sea-Land Service, Inc.*, 20 FMC 152 (1977) to support its holding is incorrect. A rejection of the refund application in the *Munoz* case served the statutory purposes not because the intended and new rates differed, but rather because the new rate was both lower than and unjustifiably different from that intended by the parties. The danger of rebate and blatant rate alteration which was controlling in that case is wholly absent here, where the new rate is both higher than and justifiably different from the intended figure. It was error for FMC to ignore the clear distinctions between the *Munoz* case and this case.[12]

---

10. The relevant portions of the legislative history contain such terms as "a promised rate" and "a specific rate promised to a shipper." Hearings on H.R. 9473 Before the Subcommittee on Merchant Marine of the Committee on Merchant Marine and Fisheries, 90th Cong., 1st Sess., Ser. 90–11, at 95 (Aug. 15, 1967); Hearing on S.1905 Before the Subcommittee on Merchant Marine and Fisheries of the Committee on Commerce, 90th Cong., 1st Sess., Ser. 90–56, at 5–13 (Nov. 20, 1967). Both Nepera and Sea-Land agree that the Tariff 232 rate, despite its minor variation from Tariff 166, accurately reflects the specific rate which was promised to the shipper. (Exceptions, J.A. at 40; Reply Br. of Nepera at 3)

11. A concern with the dangers or rate discrimination and rebates is thus evidenced in two ways by the statute. First, proof of the originally intended rate is required so as to avoid post hoc rationalizations of impermissible rate discounts. 46 U.S.C. § 817(b)(3). Second, the carrier must file the new rate with the FMC prior to making application for a waiver and

refund of freight charges. *Id.* This filing requirement compels the carrier to make the rate on which the refund and waiver is based available to all eligible shippers, thus avoiding the possibility of discriminatory treatment. (Reply Br. of Nepera at 3, n.1)

12. In the *Munoz* case Sea-Land agreed to carry a shipment from New York to Spain at a rate of $44.00 W/M (Weight or Measure) rather than at the rate of $59.50 provided in its tariff. Due to negligence, Sea-Land failed to timely file the intended rate. The carrier filed a corrective tariff pursuant to section 18(b)(3) prior to its application for waiver and refund, but the new tariff published a rate of $40 W/M rather than the agreed-upon rate of $44 W/M. The FMC denied the waiver and refund application, stating that " 'the new tariff' is expected to reflect a prior intended rate, not a rate agreed upon after the shipment." 20 FMC at 153.

The corrected tariff in the *Munoz* case contained a rate "which was never agreed upon or intended to be filed." 20 FMC at 153. More-

An interpretation of section 18(b)(3) which permits the minor rate variation here is appropriate for several reasons. First, such a construction alone serves the remedial purposes of the statute. Surely "it is the business of the judges so to construe the act as to suppress the mischief and advance the remedy." I Blackstone's Commentaries 87. Second, the FMC's concern with a trifling mathematical variance results in an economic absurdity. "If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 460, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). There is no support in the statute, legislative history, case law, or in common sense for FMC's requirement of mathematical exactitude.

"If ever we are justified in reading a statute, not narrowly as through a keyhole, but in the broad light of the evils it aimed at and the good it hoped for, it is here." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 557–558, 63 S.Ct. 379, 390–391, 87 L.Ed. 443 (1943) (Jackson, J., *dissenting*): "for the letter killeth, but the spirit giveth life." II Corinthians 3:6. FMC must accept the Sea-Land application.

This case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

over, because the new rate was substantially lower than that intended to be filed, there was a clear danger of rebate to the shipper. In addition, no complex rate conversion of any kind was involved. The case was a clear example of a carrier filing a corrective tariff containing a rate which had not been agreed upon, had not been intended, and could not arguably be deemed to "reflect" the promised rate. In our case, on the other hand, the corrected rate was that agreed upon and intended, the slight overcharge eliminates the possibility of rebate, and the justifiable reasons for the minor charge variation make it certain that the new rate reflects the promised rate. The *Munoz* case is legally distinct—not just factually different—from this case.