818 F.2d 953
 260 U.S.App.D.C. 304
 Eric J. BARNETT, individually and as parent and next friend
of Rachael Lynn Barnett, a minor, Appellant,
v.
Caspar WEINBERGER, Secretary of Defense of the United States
of America.
 No. 81-2122.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 27, 1982.
Decided May 15, 1987.
As Amended May 15, 1987.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 81-01211).
 Michael F. X. Dolan, Bethesda, Md., for appellant.
 Michael J. Ryan, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty. at the time the brief was filed, Royce C. Lamberth, R. Craig Lawrence, Asst. U.S. Attys., Cheryl M. Long, Asst. U.S. Atty. at the time the brief was filed, and Paul S. Koffsky, Atty., Dept. of Defense, were on the brief, for appellee. Kenneth M. Raisler, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, also entered an appearance for appellee.
 Before ROBINSON, Circuit Judge, and McGOWAN and MacKINNON, Senior Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROBINSON.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 This appeal stems from a judgment of the District Court dismissing appellant's action for an injunction permanently barring the Department of Defense from terminating medical benefits for his daughter. We find that the decision to discontinue these benefits rests wholly upon departmental regulations which as interpreted are fatally at odds with the statutory directive they purport to implement. Accordingly, we reverse the judgment and instruct the District Court to issue the injunction sought.
 
 I. BACKGROUND
 
 2
 Rachael Lynn Barnett, appellant's thirteen-year-old daughter, is the victim of a disabling and incurable neurological condition, apparently the result of fevers occurring shortly after her birth.[1] Rachael apparently has no sight, speech, hearing, or voluntary motor function whatsoever.[2] She is generally comatose,[3] severely retarded, incontinent, and unable to dispose of bodily secretions that may collect in her throat.[4] Her functional age is under one month.[5] She suffers recurrent seizures[6] and movements of her eyes and extremities are spastic.[7] As a result, Rachael must be fed, dressed, exercised, and cleansed by an attendant. She also requires constant monitoring to ensure that accumulated secretions do not block her air passages.[8]
 
 
 3
 Unable to provide this level of care themselves,[9] Rachael's parents in 1978 put her in a hospital, and she has remained hospitalized since.[10] With the consent of the parents, Rachael has been placed on "no-code" status, meaning that "extraordinary" measures will not be instituted to combat conditions that may imminently threaten her life.[11] Instead, Rachael has been furnished hospitalization with "supportive care," consisting of satisfaction of her basic personal needs, monthly medical examinations, and the continuous supervision and attention essential to maintain breathing.[12] Because Rachael's disorder is incurable, no rehabilitative or other treatment to improve her condition has been prescribed.[13]
 
 
 4
 From the start, the expense of Rachael's hospitalization has been absorbed as a basic benefit under the Civilian Health and Medical Program for the Uniformed Services (CHAMPUS), a system of federally-subsidized health care available to dependents of active-duty military personnel and others.[14] Rachael qualifies as an eligible dependent because her father is a commissioned officer in the United States Navy and a participant in the program.[15]
 
 
 5
 In May, 1979, the Office of CHAMPUS notified appellant that, in its opinion, Rachael's hospitalization supplied only "custodial care,"[16] attention of a kind statutorily excluded from the program.[17] Appellant was informed that consequently CHAMPUS basic benefits would cease, but that Rachael might qualify for assistance available to significantly handicapped dependents of active-duty military personnel.[18] Any aid Rachael might receive as a handicapped child, however, was and is limited to $12,000 per year,[19] a sum plainly inadequate to meet Rachael's annual hospital bills, then approximately $53,000.[20] Cessation of Rachael's CHAMPUS benefits thus would compel her release from hospitalization into some other institutional setting or perhaps even parental care.
 
 
 6
 Hoping to save those benefits, appellant filed suit in the United States District Court for the District of Maryland to enjoin the scheduled termination.[21] In exchange for appellant's voluntary dismissal of that action, it was agreed that the decision to discontinue benefits would be administratively reconsidered.[22] The Office of CHAMPUS staff then reexamined Rachael's case, but again concluded that Rachael did not qualify for basic coverage because her hospitalization provided no more than "custodial care."[23] This determination was upheld in turn by a hearing officer,[24] on review by the Director of the Office of CHAMPUS,[25] and finally by the Principal Deputy Assistant Secretary of Defense for Health Affairs.[26] Central to the decision at each level were departmental regulations undertaking definition of the statutory exclusion of "custodial care," and the decision-maker's understanding of the effect of the regulations in Rachael's situation.[27]
 
 
 7
 Having exhausted his administrative options, appellant instituted the present suit to enjoin any stoppage of CHAMPUS benefits as arbitrary.[28] The District Court found the projected discontinuation of such benefits supported by substantial evidence, and denied an injunction and dismissed the action.[29] Thereupon, appellant turned to this court.[30]
 
 II. MEDICAL CARE FOR MILITARY DEPENDENTS
 
 8
 Traditionally, dependents of members of the Armed Forces have been provided health care in military facilities whenever the space and staff essential thereto could be utilized without jeopardizing medical service to personnel on active duty.[31] The dependent-care practices long pursued in military circles, however, left much to be desired. Positive statutory authority to accommodate dependent medical service was fragmentary;[32] this bred disparities in the types of care afforded and the categories of dependents able to seek them.[33] Moreover, an estimated 40 percent of dependents could not obtain medical care in military facilities,[34] primarily because of overcrowding, physician shortages, or residence outside the areas served by those facilities.[35] 5] Inadequacies of these sorts in the dependent medical care system in vogue generated what ultimately came to be recognized as "one of the most serious morale problems facing our Armed Forces."[36]
 
 A. The Statutory Scheme
 
 9
 In 1956, Congress passed the Dependents' Medical Care Act[37] as the means of rectifying these shortcomings. The broad purpose of the Act was "to create and maintain high morale throughout the uniformed services by providing an improved and uniform program of medical care for members of the uniformed services and their dependents."[38] Uniformity was attained by explication of the types of medical care that can and cannot be provided[39] and precise definition of the categories of dependents eligible for them.[40] The principal improvement was authority to contract for provision of medical care by civilian hospitals and physicians to dependents of active-duty military personnel, thus increasing the availability of medical services beyond the capacity of military hospitals and staffs.[41] Ten years later, by the Military Medical Benefits Amendments of 1966,[42] medical care available to dependents of active-duty personnel was expanded even further,[43] and still other changes have been wrought by subsequent legislation.[44]
 
 
 10
 The truly outstanding feature of the Dependents' Medical Care Act, however, is that it converted the provision of military-dependent medical care from a mere act of grace to a full-fledged matter of right. The Act specifies, in the respects pertinent to this case, that "[a] dependent of a member of a uniformed service who is on active duty for a period of more than 30 days ... is entitled, upon request, to the medical and dental care prescribed by [the Act] in facilities of the uniformed services, subject to the availability of space and facilities and the capabilities of the medical and dental staff."[45] And, "[t]o assure that medical care is available for spouses and children of members of the uniformed services who are on active duty for a period of more than 30 days," the Act commands the Secretary of Defense, "after consulting with the other administering Secretaries,[46] [to] contract ... for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate."[47] With but a single exception, an eligible dependent may elect to receive authorized medical care either in a military facility or a facility provided under a plan contracted for.[48] As the House Report declared, "for the first time in the history of the uniformed services, dependents will be provided with a statutory entitlement to medical care on a uniform basis throughout all the uniformed services."[49]
 
 
 11
 Hospitalization is a form of care that the Act permits,[50] and an unmarried legitimate child under age 21 is an eligible dependent.[51] Appellant, Rachael's father, has elected civilian hospitals and physicians over military facilities and personnel, and has accepted a civilian hospital in the area to which he is now assigned.[52] It follows that but for the regulations the Department of Defense invoked and the interpretation the Department gave them, the injunction appellant sought should have been granted.
 
 
 12
 While access to statutorily-authorized military-dependent medical care is a legal entitlement, Congress has imposed limitations on the types of care that CHAMPUS can supply,[53] among which is a ban on "[d]omiciliary or custodial care."[54] The regulations utilized to deny Rachael continued hospitalization purport to define these terms,[55] and the administrative construction given "custodial care" foreclosed further CHAMPUS benefits.[56] We turn, then, to determine whether these regulations and their application to Rachael comport with the mandates of the Act.
 
 B. The Challenged Regulations
 
 13
 Rachael's unfortunate and singular plight obviously demands precise identification of the boundaries of the statutory exclusion of "custodial care." Not only must her elemental personal needs be satisfied, but her life depends entirely upon medical personnel who, through constant supervision and attention, insure that she does not perish from her bodily fluids.[57] Moreover, the level of medical support necessary to safeguard Rachael against that hazard can be obtained only in a hospital. As Rachael's personal physician testified, entirely without contradiction, care in the home would not be adequate for her:
 
 
 14
 [Rachael] needs hospitalization, because she cannot handle her own secretions. She's a vegetable. She cannot do anything independently. And to put her in a residential setting, where somebody might check on her twice a day, I'm afraid the third time they checked, she would be dead.[58]
 
 
 15
 The touchstone of the Secretary's claim that Rachael is not entitled to basic CHAMPUS benefits is a set of regulations attempting to define the meaning of the term "custodial care" as used in the statutory exclusion.[59] These provisions establish a four-part definition. "Custodial care" is said to be
 
 
 16
 [c]are rendered to a patient--
 
 
 17
 (i) who is disabled mentally or physically and such disability is expected to continue and be prolonged and
 
 
 18
 (ii) who required a protected, monitored or controlled environment whether in an institution or in the home, and
 
 
 19
 (iii) who requires assistance to support the essentials of daily living, and
 
 
 20
 (iv) who is not under active or specific medical, surgical, or psychiatric treatment that will reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored, or controlled environment.[60]
 
 
 21
 The regulations provide that "[i]t is not the condition itself that is controlling, but whether the care being rendered falls within the definition of custodial care...."[61] And "[t]he determination of custodial care in no way implies that the care being rendered is not required by the patient; it only means that it is the kind of care that is not covered under the Basic Program."[62] The regulations declare additionally that "[a] custodial care determination is not precluded by the fact that a patient is under the care of a supervising or attending physician and that services are being ordered and prescribed to support and generally maintain the patient's condition, or provide for the patient's comfort, or insure the manageability of the patient. Further, a custodial care determination is not precluded because the ordered and prescribed services and supplies are being provided by an R.N., L.P.N., or L.V.N."[63] By reason of this regulatory structure, the administrative decisionmakers were impelled to deny benefits to Rachael for hospital costs that otherwise would have been paid.[64]
 
 
 22
 The question we face is whether, particularly in light of the potentially fatal consequences of a withdrawal of inpatient medical care, the "custodial care" regulations, either as written or applied, are invalid for their interception of a patient in Rachael's precarious situation. The Secretary relies wholly upon the regulations as a permissible interpretation of the statutory exclusion, and upon the administrative decision as an equally proper application of the regulations.[65] On his part, appellant disputes neither that the first three elements of the administrative definition of "custodial care"[66] permissibly stake out the exclusion's general sphere, nor that what otherwise would be "custodial care" can qualify for benefits if rehabilitative in nature. He contends, simply, that inclusion within "custodial care" of care necessary to sustain life and available only in a hospital expands the concept of "custodial care" beyond the bounds of the statutory exclusion.[67] 7] The issue thus is not the extent to which the first three factors enumerated in the regulations might properly comprise parts of an acceptable definition of "custodial care," but whether the regulations characterizing medically-essential hospital service as excluded "custodial care" comport with the statutory provision on that subject.
 
 
 23
 III. THE DEFERENCE DUE THE ADMINISTRATIVE CONSTRUCTION
 
 
 24
 Construction of a statute by the agency charged with its administration is normally entitled to deference,[68] and should not be gainsaid absent cogent,[69] weighty,[70] or compelling[71] reasons. This is especially so when, as here, the agency proffering the construction assisted in drafting of the legislation.[72] Owing to the presence here of factors that traditionally have diminished the influence of administrative interpretations, however, we believe that neither the regulations in dispute nor the agency decision in Rachael's instance commands appreciable respect.
 
 
 25
 It is well established that the prestige of a statutory construction by an agency depends crucially upon whether it was promulgated contemporaneously with enactment of the statute[73] and has been adhered to consistently over time.[74] Neither of these conditions has been satisfied in the case before us. The Secretary adopted the questioned regulation in 1977,[75] eleven years after passage of the 1966 enabling legislation in which Congress first spoke of "custodial care."[76] Beyond that, the 1977 regulations represent a quite different and broader interpretation than previously adopted by the Department. Under the earlier construction, Rachael[77] and at least 160 other patients received basic benefits under CHAMPUS for medical care which the regulations now classify as "custodial."[78] That later a need for a grandfathering clause in the regulations[79] was perceived shows that the regulations altered the original administrative definition of "custodial care" in a significant way. Additionally, various guidelines promulgated immediately after enactment of the 1966 amendments suggested that neither medically-necessary hospitalization[80] nor nursing, medical, or paramedical services required on a continuing basis[81] constituted excluded "custodial care." In short, the 1977 regulations were neither contemporaneous with enactment of the statute nor consistent with earlier interpretations of the same statutory terminology, and thus do not merit a substantial degree of respect as an aid to construction of the statutory language.
 
 
 26
 In addition to these difficulties, we are mindful that an administrative interpretation is not of itself dispositive of an issue of statutory construction.[82] Rather, its force depends upon other factors, including the thoroughness and validity of its reasoning,[83] and its compatibility with the general purposes that motivated enactment of the legislation interpreted.[84] The CHAMPUS regulations also fail to measure up under these standards. The regulations were issued without any public notice and without benefit of any comment thereon.[85] No explanation or discussion of the regulations was offered at the time, nor was any attempt made to support the regulations by an analysis of the legislative history underlying the statute.[86] Indeed, the later amendment of the regulations by insertion of a grandfathering provision[87] suggests that they were originally promulgated without adequate consideration of their impact upon existing beneficiaries or evaluation of their consistency with statutory authority and previous administrative practice. We note, too, that the regulations' broad-gauged reading of the statutory exclusion is antithetical to the general statutory purpose, for the prime objective of the Dependents' Medical Care Act was enhancement, not reduction, of the benefits to be accorded to military personnel and their dependents.[88] Against this backdrop of congressional intent, it seems highly incongruous that the scope of a statutory exclusion from benefits should be expanded eleven years after adoption of the ameliorating legislation.
 
 
 27
 In sum, the regulations in question were issued after what appears to have been cursory consideration, were accompanied by neither explanation nor justification, and were given a breadth that does not comport with the purposes animating the statute purportedly interpreted. These elements buttress our conclusion that the regulations are not entitled to significant weight in delineating the scope of the statute's "custodial care" provision.[89]
 
 
 28
 We emphasize, as the Supreme Court[90] and this court[91] often have, that "statutory construction ultimately is a judicial function."[92] While an agency's interpretation of any statute it administers must be fully and respectfully considered, its reading ultimately prevails, if at all, only by virtue of the persuasive power it exerts.[93] Deference to interpretative agency promulgations should not lapse into mere " 'judicial inertia,' "[94] and we would neglect a fundamental responsibility were we to " 'stand aside and rubber-stamp [our] affirmance of administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrates the congressional policy underlying a statute.' "[95] Since, in the case at bar, several important factors seriously undermine the Secretary's interpretation of the statutory term "custodial care," we can discharge our obligation to ascertain the soundness of the disputed agency decision only by independent investigation and analysis of the statutory framework in light of the relevant legislative history.
 
 IV. THE LEGISLATIVE HISTORY
 
 29
 When, in 1956, the Dependents' Medical Care Act[96] established the first comprehensive statutory program of medical benefits for military dependents, that legislation adopted the forerunner of the statutory exclusion involved here, providing that "[h]ospitalization ... is not authorized dependents for domiciliary care."[97] Congress made no reference to "custodial care,"[98] however, until the Military Medical Benefits Amendments of 1966,[99] when it redrafted the exclusion to encompass "[d]omiciliary or custodial care."[100]
 
 
 30
 As in the instance of "custodial care,"[101] the statutory text does not indicate the nature of "domiciliary care."[102] The CHAMPUS regulations, however, reflect the general understanding as to what "domiciliary care" is and is not.[103] "Domiciliary care" is defined as
 
 
 31
 inpatient institutional care provided the beneficiary not because it is medically necessary, but because the care in the home setting is not available, is unsuitable, or members of the patient's family are unwilling to provide the care.[104]
 
 
 32
 Examples of "domiciliary care" situations are given.[105] As both the definition and the illustrations make clear, "domiciliary care" does not include hospitalization that is medically essential.[106]
 
 
 33
 This concept of "domiciliary care" is highly significant, for it sheds important light upon the meaning of "custodial care" when the latter was inserted into the exclusionary section in 1966. Congress enacted the 1966 amendments to enhance morale among military units,[107] to promote the attractiveness of military careers,[108] to discharge a moral obligation to the uniformed services,[109] and to provide military personnel with medical benefits comparable to those extended to federal civilian employees.[110] Consistently with these objectives, the legislative history is replete with descriptions and endorsements of proposed legislation as improvements and expansions of existing benefits;[111] indeed, several Members of Congress stated explicitly that the legislation was not to be taken to downgrade or erode in any way the benefits then available to those in military service.[112] In view of this irrefutable legislative purpose, as well as the absence of any congressional discussion of the newly-drafted reference to "custodial care" or any acknowledgment that the 1966 amendments enlarged the existing exclusion, it would be highly anomalous to suppose that by this language Congress designed an exclusion of necessary medical service from basic CHAMPUS benefits.
 
 
 34
 The relevant committee reports provide even stronger confirmation that Congress did not intend the term "custodial care" to embody such an exclusion. The 1966 House Report stated explicitly that "domiciliary or custodial" care was already exlcuded under existing law[113]--which, as we have noted, featured an exclusion referring only to "domiciliary" care,[114] which does not embrace care that is medically necessary.[115] The 1966 Senate Report indicated likewise, characterizing the newly-drafted exclusion as no more than "a continuation of existing law."[116] It seems apparent that neither House contemplated a reading of the exclusion of "domiciliary or custodial care" as a ban on hospitalization that is medically required.
 
 
 35
 Other legislative history strongly underscores this conclusion. Especially significant are the unchallenged statements of legislators that dependents of uniformed personnel would become statutorily entitled to coverage of the costs of all necessary hospitalization and other medical care. In support of the bill that ultimately became the Dependents' Medical Care Act of 1956, for example, Representative Van Zandt declared:
 
 
 36
 This hospital coverage for dependents includes not only maternity care but necessary medical and surgical treatment as well.[117]
 
 He reiterated:
 
 37
 The point I wish to emphasize is that for the first time since the days before World War II we can say to any man who is serving our country in the Armed Forces, "[y]ou need no longer worry that your wives and children will not receive adequate medical care. Wherever your duty takes you, your family can now be given hospital care when they need it."[118]
 
 
 38
 Similarly, during debate on the 1966 amendments, Representative Pirnie explained that they would "improve the level of care for military dependents who need hospitalization."[119] Representative Chamberlain echoed with this comment:
 
 
 39
 All the costs that will be borne by military families under the various provisions of this legislation are minimal. The important consideration is that care will be available whenever and wherever required.[120]
 
 
 40
 So far as we can tell, it was common ground both in 1956 and in 1966 that Congress was acting to ensure that servicemen and their dependents would receive benefits for medically-essential hospitalization.
 
 
 41
 Similarly supportive of this is the particular terminology that Members of Congress employed in characterizing the nature of the exclusion. On numerous occasions, in committee reports as well as in legislative debate, the scope of the exclusion was described as limited to "convalescent" and "nursing home" care,[121] appellations strongly implying that Congress did not intend to embrace within the exclusion medical care available or practical only in a hospital. It is noteworthy, too, that the Senate Report on the 1966 amendments justified the exclusion of convalescent and nursing-home care on the ground that it "is technically not hospitalization"[122]--even more plainly an indication that Congress did not signify a denial of CHAMPUS basic benefits to patients actually in need of hospitalization.
 
 
 42
 To summarize, the legislative history of the exclusion for "domiciliary and custodial care" fortifies the conclusion that Congress did not eliminate the expense of medically-essential hospitalization from protection as a basic CHAMPUS benefit. It thus confirms appellant's position that Rachael Barnett's hospitalization, which plainly enough is necessary to keep her alive, is beyond the pale of the exclusion.
 
 V. JUDICIAL INTERPRETATIONS
 
 43
 As the final leg of our quest for the meaning of the statutory exclusion for "domiciliary or custodial care," we examine the construction other courts have given comparable statutory language in closely analogous contexts.[123] We derive particularly valuable guidance from cases involving the Social Security Act, which removes from Medicare coverage non-hospice care deemed to be "custodial" in nature.[124] As in the legislation before us today, Congress supplied no definition of "custodial care" in the exclusion from Medicare protection. Nevertheless, the courts almost uniformly have interpreted as descriptive of this type of care that which "can be provided by a lay person without special skills and not requiring or entailing the continued attention of trained or skilled personnel."[125]
 
 
 44
 The cases have recognized and hewed to a sharp distinction between routine maintenance and the provision of essential medical service. In Ridgely v. Secretary of HEW,[126] for example, the plaintiff, who had suffered a severely fractured hip, was released from a hospital to an extended care facility. Constant supervision of the patient was required, however, to ensure that she did not dislodge the internal supports binding her fracture, and to treat an embolism in her leg. Stressing the necessity of medical attention, the court refused to characterize her stay in the facility as "custodial care," but instead allowed her to collect Medicare benefits during convalescence.[127] In so doing, the court refused to accept the Secretary's position that the care received by the patient "was primarily supportive in nature, and, therefore, specifically excluded from coverage by the 'custodial care' exclusion."[128] Other cases have reached similar conclusions through similar reasoning.[129]
 
 
 45
 We are unable meaningfully to distinguish Rachael Barnett's situation. Her needs include skilled nursing care--that which "requires the direct supervision of licensed nursing personnel under the general direction of a physician."[130] This is diametrically opposed to the provision of mere custodial care, which "could be administered by a layman, without any possible harm to the health of the one in custody."[131]
 
 
 46
 The Department of Defense believed, however, that some comparative measurement of the different types of care rendered to a patient should dictate a characterization of the treatment overall. In its Final Decision,[132] the Department identified the principal issue in dispute as whether "the inpatient care the beneficiary/patient is receiving is primarily custodial,"[133] and this terminology was the pervasive theme of the decision. After reviewing the extensive disabilities with which Rachael is afflicted, the Department felt that her treatment is "primarily custodial in nature,"[134] and regarded this conclusion as dispositive of Rachael's claim for basic CHAMPUS benefits.
 
 
 47
 We find this position untenable. Even a moment's reflection brings to mind a host of medical maladies for which professional medical treatment is undeniably necessary but which also involve significant supplemental non-medical care. To suggest that a victim of a catastrophic illness or a severe accident is receiving "custodial care" simply because the "primary" portion of her attendants' time is spent providing for her elemental needs is patently misguided.[135] The critical factor is not the division or percentage of the labor daily received by the patient but the essential nature of the patient's call for supervision and ministration, even if considerably less frequent, from medical professionals.
 
 
 48
 The courts have held that the coupling of skilled medical therapy with more mundane treatment, such as feeding and cleansing, does not preclude Medicare coverage for any portion of the expense incurred. This combination was explicitly addressed in Kuebler v. Secretary of HHS,[136] in which the putative beneficiary sought Medicare reimbursement for her stay in a skilled nursing facility. Noting that the claimant's "condition shows progressive deterioration to the point where she [is] a danger to her own well-being and need[s] care,"[137] the court refused to allow HHS to bifurcate her treatment into medically-essential and nonessential tasks. "Although many specific services rendered to [the patient] were routine and seemingly unskilled, in the aggregate they were treatment of her medical condition."[138]
 
 
 49
 Judicial refusal to characterize treatment as custodial merely because required care encompasses certain routine maintenance functions is perhaps best expressed in Sowell v. Richardson.[139] It was there asserted that only care that "must be given under the supervision of a registered professional nurse"[140] was covered by Medicare, and that any aid failing to meet this standard was custodial and therefore not compensable. The court rejected this definition and its application to a terminally-ill 72year-old cancer victim who received treatment in a nursing home.[141] Instead, the court espoused a "sensible nontechnical approach to interpretation of [custodial care] in order to give effect to the purpose of the Act and to afford equitable treatment to those seeking its benefits."[142] "It was never intended by Congress," the court said, "that the condition of the insured, treatment that might at any time be necessary, and the pain and discomfort attending inadequate or unprofessional care or lack of care not be considered together with treatment actually provided in determining whether extended care services are justified."[143] Even where immediate, constant care is not required, the unstable condition of the patient may thus necessitate skilled nursing supervision.
 
 
 50
 What otherwise would be "custodial care" when standing alone may, under the Social Security Act, be assimilated to medical care "in light of the statute's benevolent congressional purpose" and considering "the needs and underlying condition of the claimant insured as a whole."[144] We see no reason for supposing that Congress had less concern for the welfare of beneficiaries under CHAMPUS. Nor are we able to distinguish Rachel's case from those in the mainstream of evolving judicial doctrine. To continue living she must have skilled nursing care--that which "requires the general supervision of licensed nursing personnel under the general direction of a physician."[145] That treatment of this type involves attendant routine maintenance does not change the nature of her life-sustaining need. This medically-necessary service is precisely the kind the courts have refused to label "custodial" under the Social Security Act. No more should it be permitted to provide the predicate for termination of basic benefits under CHAMPUS.
 
 VI. CONCLUSION
 
 51
 Our inquiry into the history of the CHAMPUS legislation has revealed that Congress did not intend the exclusion for "domiciliary or custodial care" to include medical care that is truly essential. In light of this plain congressional purpose, we decline to defer to the Secretary's contrary construction of the statutory exclusion. We hold that the challenged CHAMPUS regulation, as written or as applied, is invalid insofar as it purports to treat medically-necessary patient care obtainable only in a hospital as excluded "custodial care."
 
 
 52
 At times during administrative review of Rachel's claim, the Department of Defense seemed to accept at face value the contention that her hospitalization is medically essential.[146] In its final decision, however, aside from its abiding allegiance to "primarily custodial," the Department appeared to question feebly whether any sort of hospitalization was needed.[147] The insuperable difficulty in this position is that the Secretary does not identify, nor have we independently found, evidence buttressing the several circumstances mentioned by the final decisionmaker in this regard. In assessing the factual soundness of the agency decision under review, we must ascertain whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[148] And in making that determination, we must remain mindful that "findings" of adjudicative facts that are not supported by substantial evidence are arbitrary.[149] The factual speculations in the agency's final decision run afoul of that principle, and we cannot accept them.
 
 
 53
 The judgment appealed from is reversed, and the case is remanded to the District Court with direction to issue the injunction sought by appellant.
 
 
 54
 So ordered.
 
 
 
 [1]
 See Medical History, prepared by John R. Vroom, M.D., Hospital for Sick Children (Sept. 18, 1978), Administrative Record (A.R.) 561 [hereinafter Medical History]
 
 
 [2]
 Final Decision, Office of Assistant Secretary of Defense (Health Affairs), Case File 11-80 (May 13, 1981), at 4, A.R. 6 [hereinafter Final Decision]
 
 
 [3]
 Brief for Appellant at 7; Brief for Appellee at 4; see also Deposition of John M. Pellock, M.D., at 85-86, A.R. 309-310
 
 
 [4]
 See Deposition of John M. Pellock, M.D., at 85-86, A.R. 309-310; Final Decision, supra note 2, at 4, A.R. 6
 
 
 [5]
 Final Decision, supra note 2, at 4, A.R. 6
 
 
 [6]
 Deposition of John M. Pellock, M.D., at 85, A.R. 309
 
 
 [7]
 Final Decision, supra note 2, at 4, A.R. 6
 
 
 [8]
 See Deposition of John M. Pellock, M.D., at 85, A.R. 309; Final Decision, supra note 2, at 4, A.R. 6; Brief for Appellant at 7; Brief for Appellee at 5-6
 
 
 [9]
 See Medical History, supra note 1, A.R. 562
 
 
 [10]
 Brief for Appellant at 8; Brief for Appellee at 4. Rachael was first placed in the Hospital for Sick Children in Washington, D.C. We were informed by a memorandum filed by the Secretary, Barnett v. Weinberger, No. 81-2122 (D.C.Cir.) (Mar. 12, 1984), that in connection with the change of duty station of her father, a naval commander, Rachael has been transferred to Friendship Homes in National City, California. In a letter accompanying this memorandum, Dr. Joseph Joyner, Rachael's attending physician at Friendship Homes, states that "[s]he was admitted for continued medical care and management." Letter from Joseph Joyner, M.D., to Eric J. Barnett (Feb. 7, 1984)
 
 
 [11]
 Testimony of Eric J. Barnett (Apr. 16, 1980) at 58, A.R. 94
 
 
 [12]
 See Medical Statement of John R. Vroom, M.D. (July 31, 1979), A.R. 150-152 [hereinafter Medical Statement]
 
 
 [13]
 See Physician's Progress Notes, prepared by John R. Vroom, M.D., A.R. 536, 538, 540, 542, 545
 
 
 [14]
 The CHAMPUS program is discussed in Part II(A) infra
 
 
 [15]
 See Brief for Appellant at 7; Brief for Appellee at 2. See also note 51 infra and accompanying text
 
 
 [16]
 Letter from Barbara J. Easley to Eric J. Barnett (May 17, 1979), A.R. 217-219
 
 
 [17]
 See Part II(A) infra
 
 
 [18]
 Letter from Barbara J. Easley to Eric J. Barnett, supra note 16, A.R. 217-219
 
 
 [19]
 10 U.S.C. Sec. 1079(e) (1982 & Supp. III 1985); 32 C.F.R. Sec. 199.5(b) (1986); see Brief for Appellant at 19; Appellee's Response to Order of the Court (filed Jan. 17, 1983), Barnett v. Weinberger, No. 81-2122 (D.C.Cir.), at 4 [hereinafter Appellee's Response to Order]
 
 
 [20]
 Affidavit of Eric J. Barnett (May 26, 1981), Appendix (App.) 10. Although these monetary estimates may now be outdated, neither litigant has provided us with reason to doubt that a staggering disparity between them continues to exist
 
 
 [21]
 See Complaint for Injunction (June 26, 1979), Barnett v. Brown, Civ. No. B-79-1194 (D.Md.), A.R. 161-164
 
 
 [22]
 See Stipulated Motion to Dismiss (July 19, 1979), Barnett v. Brown, Civ. No. B-79-1194 (D.Md.), A.R. 156-157
 
 
 [23]
 Letter from Barbara J. Easley to Eric J. Barnett (Aug. 28, 1979), A.R. 146-148
 
 
 [24]
 Recommended Decision of Hearing Officer (July 16, 1980), A.R. 25-35 [hereinafter First Recommended Decision]
 
 
 [25]
 Recommended Decision of Director of Office of CHAMPUS (Oct. 16, 1980), A.R. 18-23 [hereinafter Second Recommended Decision]
 
 
 [26]
 Final Decision, supra note 2, A.R. 3-16. See 32 C.F.R. Sec. 199.10(e)(1)(i)-(iii) (1986)
 
 
 [27]
 See note 64 infra and accompanying text
 
 
 [28]
 Complaint, Barnett v. Weinberger, Civ. No. 81-1211 (D.D.C.) (filed May 26, 1981), App. 1
 
 
 [29]
 Barnett v. Weinberger, Civ. No. 81-1211 (D.D.C.) (Aug. 21, 1981) (judgment), App. 105
 
 
 [30]
 Notice of Appeal, Barnett v. Weinberger, Civ. No. 81-1211 (D.D.C.) (filed Oct. 16, 1981), App. 147
 
 
 [31]
 S.Rep. No. 1878, 84th Cong., 2d Sess. 1 (1956); H.R.Rep. No. 1805, 84th Cong., 2d Sess. 1 (1956) U.S.Code Cong. & Admin.News 1956, p. 2698
 
 
 [32]
 S.Rep. No. 1878, supra note 31, at 2; H.R.Rep. No. 1805, supra note 31, at 1
 
 
 [33]
 See S.Rep. No. 1878, supra note 31, at 2; H.R.Rep. No. 1805, supra note 31, at 1-2
 
 
 [34]
 S.Rep. No. 1878, supra note 31, at 4; H.R.Rep. No. 1805, supra note 31, at 2, 4
 
 
 [35]
 S.Rep. No. 1878, supra note 31, at 2; H.R.Rep. No. 1805, supra note 31, at 2, 4
 
 
 [36]
 H.R.Rep. No. 1805, supra note 31, at 2; see also S.Rep. No. 1878, supra note 31, at 2
 
 
 [37]
 Pub.L. No. 569, 70 Stat. 250 (1956) (codified as amended at 10 U.S.C. Secs. 1071-1094 (1982 & Supp. III 1985) and 10 U.S.C.A. Secs. 1071-1095 (West 1983 & Supp.1986)) [hereinafter sometimes cited as codified]
 
 
 [38]
 Id. Sec. 101 (codified as amended at 10 U.S.C. Sec. 1071 (1982))
 
 
 [39]
 10 U.S.C. Sec. 1077 (1982 & Supp. III 1985)
 
 
 [40]
 10 U.S.C. Sec. 1072 (1982 & Supp. III 1985)
 
 
 [41]
 See 10 U.S.C. Secs. 1079-1083 (1982 & Supp. III 1985)
 
 
 [42]
 Pub.L. No. 89-614, 80 Stat. 862 (1966) (codified variously at 10 U.S.C. Secs. 1071-1087 (1982)) [hereinafter sometimes cited as codified]
 
 
 [43]
 This legislation also enlarged the class of beneficiaries by establishing inpatient and outpatient programs in civilian facilities for retired military personnel, their spouses and children, and spouses and children of deceased active-duty and retired personnel, see 10 U.S.C. Secs. 1074, 1076, 1078-1079(a)-(b), 1086-1087 (1982 & Supp. III 1985), and by inaugurating a new program of financial assistance for mentally retarded or physically handicapped dependents of active-duty personnel, see id. Sec. 1079(d)
 
 
 [44]
 See Pub.L. No. 89-718, 80 Stat. 1115 (1966); Pub.L. No. 91-481, 84 Stat. 1081 (1970); Pub.L. No. 92-58, 85 Stat. 157 (1971); Pub.L. No. 94-464, 90 Stat. 1985 (1976); Pub.L. No. 95-397, 92 Stat. 849 (1978); Pub.L. No. 95-485, 92 Stat. 1611 (1978); Pub.L. No. 96-173, 93 Stat. 1287 (1979); Pub.L. No. 96-342, 94 Stat. 1077 (1980); Pub.L. No. 96-513, 94 Stat. 2835 (1980); Pub.L. No. 96-552, 94 Stat. 3254 (1980); Pub.L. No. 97-22, 95 Stat. 124 (1981); Pub.L. No. 97-86, 95 Stat. 1099 (1981); Pub.L. No. 97-124, 95 Stat. 1666 (1981); Pub.L. No. 97-252, 96 Stat. 718 (1982); Pub.L. No. 97-295, 96 Stat. 1287 (1982); Pub.L. No. 97-337, 96 Stat. 1631 (1982); Pub.L. No. 97-375, 96 Stat. 1819 (1982); Pub.L. No. 98-94, 97 Stat. 614 (1983); Pub.L. No. 98-525, 98 Stat. 2492 (1984); Pub.L. No. 98-557, 98 Stat. 2860 (1984); Pub.L. No. 99-145, 99 Stat. 583 (1985); Pub.L. No. 99-272, 100 Stat. 82 (1986); Pub.L. No. 99-399, 100 Stat. 853 (1986); Pub.L. No. 99-661, 100 Stat. 3816 (1986)
 
 
 [45]
 10 U.S.C. Sec. 1076(a) (1982)
 
 
 [46]
 The Secretary of Defense administers the Act for the military forces under his jurisdiction, the Secretary of Health and Human Services for the National Oceanic and Atmospheric Administration and the Public Health Service, and, since 1984, the Secretary of Transportation for the Coast Guard when it is not operating as a service to the Navy. 10 U.S.C. Sec. 1073 (Supp. III 1985)
 
 
 [47]
 Id. Sec. 1079(a)
 
 
 [48]
 Id. Sec. 1080. The exception is that this option may be limited by regulation when the dependent resides in an area where the military member is assigned and an adequate military facility is available in that area for the dependent. Id
 
 
 [49]
 H.R.Rep. No. 1805, supra note 31, at 4
 
 
 [50]
 10 U.S.C. Sec. 1077(a)(1) (1982)
 
 
 [51]
 Id. Sec. 1072(2)(D)(i). Rachel also qualifies as an eligible dependent on the further ground that she is incapable of self-support because of a mental or physical condition existing before her 21st birthday. Id. Sec. 1072(2)(D)(ii)
 
 
 [52]
 See note 10 supra
 
 
 [53]
 These restrictions are expressly directed at services furnished in a military facility, see 10 U.S.C. Sec. 1077(b) (1982 & Supp. III 1985), but, with exceptions not applicable here, the services made available through contracts with private providers of health services cannot be broader. Id. Sec. 1079(a)
 
 
 [54]
 Id. Sec. 1077(b)(1). Congress has not expressly defined either of these terms
 
 
 [55]
 See Part II(B) infra
 
 
 [56]
 See id
 
 
 [57]
 See note 8 supra and accompanying text
 
 
 [58]
 Deposition of John M. Pellock, M.D., supra note 3, at 85, A.R. 309
 
 
 [59]
 32 C.F.R. Secs. 199.2(b), 199.4(e)(12) (1986)
 
 
 [60]
 Id. Sec. 199.2(b). With respect to the kinds of conditions that can eventuate into custodial care, the regulations state that "[t]here is no absolute rule that can be applied. With most conditions, there is a period of active treatment before custodial care, some much more prolonged than others. Examples of potential custodial care cases may be a spinal cord injury resulting in extensive paralysis, a severe cerebral vascular accident, multiple sclerosis in its latter stages, or presenile and senile dementia. These conditions do not result necessarily in custodial care but are indicative of the types of conditions that sometimes do." Id. Sec. 199.4(12)(i)
 
 
 [61]
 Id. Sec. 199.4(12)(i)
 
 
 [62]
 Id. Sec. 199.2(b) note
 
 
 [63]
 Id. Sec. 199.2(b)
 
 
 [64]
 At each stage of the administrative process, the decisionmaker--in turn, the Office of CHAMPUS staff, see letter from Barbara J. Easley to Eric J. Barnett, supra note 23, A.R. 146-148, the hearing officer, see First Recommended Decision, supra note 24, A.R. 26-27, 30-31, the Director of the Office of CHAMPUS, see Second Recommended Decision, supra note 25, A.R. 20-21, and the Principal Deputy Assistant Secretary of Defense for Health Affairs, see Final Decision, supra note 2, A.R. 4--expressly relied upon the "custodial care" regulations in concluding that basic benefits for Rachel should be terminated
 
 
 [65]
 See Brief for Appellee at 15-19
 
 
 [66]
 See text supra at note 60
 
 
 [67]
 See Brief for Appellant at 15-18
 
 
 [68]
 Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-845, 104 S.Ct. 2778, 2781-2783, 81 L.Ed.2d 694, 703-704 (1984); EPA v. National Crushed Stone Ass'n, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268, 283 (1980) ("great deference"); United States v. Rutherford, 442 U.S. 544, 553, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68, 77 (1979) ("substantial deference"); Miller v. Youakim, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194, 208 (1979) ("substantial factor") Adamo Wrecking Co. v. United States, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538, 550 n. 5 (1978) ("considerable weight"); Batterton v. Francis, 432 U.S. 416, 424, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448, 456 (1977) ("important" significance); Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345, 360 (1969) ("great weight"); United States v. Atlantic Ref. Co., 360 U.S. 19, 24 n. 4, 79 S.Ct. 944, 947 n. 4, 3 L.Ed.2d 1054, 1057 n. 4 (1959) ("respectful consideration"); United States v. Missouri P. R.R., 278 U.S. 269, 280, 49 S.Ct. 133, 137, 73 L.Ed. 322, 378 (1929) ("highest respect"); Brown v. United States, 113 U.S. 568, 571, 5 S.Ct. 648, 650, 28 L.Ed. 1079, 1080 (1885) ("great respect"); United States v. Moore, 95 U.S. 760, 763 (5 Otto), 24 L.Ed. 588, 589 (1877) ("most respectful consideration")
 
 
 [69]
 Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933); United States v. Missouri P. R.R., supra note 68, 278 U.S. at 280, 49 S.Ct. at 137, 73 L.Ed. at 378; Heath v. Wallace, 138 U.S. 573, 582, 11 S.Ct. 380, 383, 34 L.Ed. 1063, 1068 (1891); United States v. Johnston, 124 U.S. 236, 253, 8 S.Ct. 446, 455, 31 L.Ed. 389, 396 (1888); Brown v. United States, supra note 68, 113 U.S. at 571, 5 S.Ct. at 650, 28 L.Ed. at 1080
 
 
 [70]
 United States v. Atlantic Ref. Co., supra note 68, 360 U.S. at 24 n. 4, 79 S.Ct. at 947, n. 4, 3 L.Ed.2d at 1057 n. 4; Commissioner v. Estate of Sternberger, 348 U.S. 187, 199, 75 S.Ct. 229, 235, 99 L.Ed. 246, 256 (1955); Commissioner v. South Tex. Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831, 836 (1948)
 
 
 [71]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969), quoted in CBS, Inc. v. FCC, 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706, 720 (1981); FCC v. WNCN Listeners Guild, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521, 536 (1981); Miller v. Youakim, supra note 68, 440 U.S. at 144 n. 25, 99 S.Ct. at 969 n. 25, 59 L.Ed.2d at 209 n. 25; New York State Dep't of Social Servs. v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516-2517, 37 L.Ed.2d 688, 699 (1973); CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 121, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772, 794 (1973)
 
 
 [72]
 Miller v. Youakim, supra note 68, 440 U.S. at 144, 99 S.Ct. at 968-969, 59 L.Ed.2d at 208; Zuber v. Allen, supra note 68, 396 U.S. at 192, 90 S.Ct. at 327, 24 L.Ed.2d at 360; Adams v. United States, 319 U.S. 312, 315, 69 S.Ct. 1122, 1123, 87 L.Ed. 1421, 1423 (1943); United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345, 1354 (1940). In the case at bar, however, there is no evidence that when the amendments enacted in 1966 broadened the statutory exclusions to encompass "custodial care," see notes 98-122 infra and accompanying text, the Department of Defense either had a definite position as to the import of that term or, more important, had in any way confronted Congress with its now-current position that necessary hospital care might fall within the ambit of this exclusion. This factor persuades us to downgrade the significance of the Department's participation in the legislative process by which the 1966 amendments became law. See Zuber v. Allen, supra note 68, 396 U.S. at 193, 90 S.Ct. at 328, 24 L.Ed.2d at 360 (stressing importance of communication of agency viewpoint to Congress)
 
 
 [73]
 EEOC v. Associated Dry Goods Corp., 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762, 770 n. 17 (1981); National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519, 525 (1979); General Elec. Co. v. Gilbert, 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343, 358 (1976); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965); Power Reactor Dev. Co. v. International Union of Elec. Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961); United States v. Atlantic Ref. Co., supra note 68, 360 U.S. at 24 n. 4, 79 S.Ct. at 947 n. 4, 3 L.Ed.2d at 1057 n. 4; United States v. Zucca, 351 U.S. 91, 96, 76 S.Ct. 671, 675, 100 L.Ed. 964, 970 (1956); Norwegian Nitrogen Prods. Co. v. United States, supra note 69, 288 U.S. at 315, 53 S.Ct. at 358, 77 L.Ed. at 807; Heath v. Wallace, supra note 69, 138 U.S. at 582, 11 S.Ct. at 383, 34 L.Ed. at 1068; United States v. Johnston, supra note 69, 124 U.S. at 253, 8 S.Ct. at 455, 31 L.Ed. at 396; Brown v. United States, supra note 68, 133 U.S. at 571, 5 S.Ct. at 650, 28 L.Ed. at 1080. Of course, even a noncontemporaneous interpretation may warrant deference because of the thoroughness and validity of its reasoning. See, e.g., Great N. Ry. v. United States, 315 U.S. 262, 275, 62 S.Ct. 529, 534, 86 L.Ed. 836, 842-843 (1942). As we are about to demonstrate, however, the regulations challenged by appellant do not merit significant weight on that account
 
 
 [74]
 CBS, Inc. v. FCC, supra note 71, 453 U.S. at 382, 101 S.Ct. at 2823, 69 L.Ed.2d at 720; EEOC v. Associated Dry Goods Corp., supra note 73, 449 U.S. at 600 n. 17, 101 S.Ct. at 823 n. 17, 66 L.Ed.2d at 770 n. 17; National Muffler Dealers Ass'n v. United States, supra note 73, 440 U.S. at 485, 99 S.Ct. at 1311, 59 L.Ed.2d at 529-530; Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124, 153 n. 27 (1977); General Elec. Co. v. Gilbert, supra note 73, 429 U.S. at 142, 99 S.Ct. at 411, 50 L.Ed.2d at 358; United Housing Found., Inc. v. Forman, 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 2063 n. 25, 44 L.Ed.2d 621, 635 n. 25 (1975); Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270, 295 (1974); Udall v. Tallman, supra note 73, 380 U.S. at 17, 85 S.Ct. at 801, 13 L.Ed.2d at 626; Federal Maritime Bd. v. Isbrandtsen, 356 U.S. 481, 499-500, 78 S.Ct. 851, 862, 2 L.Ed.2d 926, 938 (1958); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944); Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587, 595 (1932); United States v. Missouri P. R.R., supra note 68, 278 U.S. at 280, 49 S.Ct. at 137, 73 L.Ed. at 378; Merritt v. Cameron, 137 U.S. 542, 552, 11 S.Ct. 174, 178, 34 L.Ed. 772, 775 (1890). In addition to consistency, courts also have considered the length of time over which the agency has adhered to its position. See, e.g., International Bhd. of Teamsters v. Daniel, 439 U.S. 551, 566 & n. 20, 99 S.Ct. 790, 800 & n. 20, 58 L.Ed.2d 808, 820 & n. 20 (1979); National Muffler Dealers Ass'n v. United States, supra note 73, 440 U.S. at 477, 99 S.Ct. at 1307, 59 L.Ed.2d at 525; Piper v. Chris-Craft Indus., Inc., supra, 430 U.S. at 41 n. 27, 97 S.Ct. at 949 n. 27, 51 L.Ed.2d at 153 n. 27; United States v. Missouri P. R.R., supra note 68, 278 U.S. at 280, 49 S.Ct. at 137, 73 L.Ed. at 378; Merritt v. Cameron, supra, 137 U.S. at 552, 11 S.Ct. at 178, 34 L.Ed. at 775; United States v. Johnston, supra note 69, 124 U.S. at 253, 8 S.Ct. at 455, 31 L.Ed. at 396. It seems evident, however, that this factor has little or no role in this litigation since, from aught that appears, Rachel's claim was one of first impression for the Department
 
 
 [75]
 See 42 Fed.Reg. 17972 (1977)
 
 
 [76]
 See Military Medical Benefits Amendments of 1966, Pub.L. No. 89-614, 80 Stat. 862 (1966) (codified as amended at 10 U.S.C.A. Secs. 1071-1095 (1983 & Supp. 1986). Furthermore, the regulation was issued 21 years after Congress placed an exclusion for "domiciliary care" in the statutory forerunner of the 1966 amendments. See Dependents' Medical Care Act of 1956, tit. I, Sec. 103(g)(1), Pub.L. No. 569, 70 Stat. 250, 252 (1956). Since Congress, when it made reference to "custodial care" in the 1966 amendments, did not intend to broaden the "domiciliary care" exclusion to include medically-necessary care, see Part IV, the 21-year period bears a great deal of relevance to our assessment of the contemporaneity of the challenged regulations
 
 
 [77]
 The earlier determination that Rachael qualified for basic benefits under CHAMPUS was made by the CHAMPUS fiscal intermediary. See Appellee's Response to Order, supra note 19, at 17
 
 
 [78]
 See First Recommended Decision, supra note 24, at 9, A.R. 33
 
 
 [79]
 The regulations expressly provide for continuation of basic benefits initially extended to otherwise eligible beneficiaries before June 1, 1977, 32 C.F.R. Sec. 199.4(e)(12)(iv) (1986), but since Rachel did not first receive benefits until 1978, she could not qualify under this provision. Appellant contends on appeal that failure of the regulations also to grandfather Rachel's claim to basic benefits, solely because she did not initially receive them prior to June 1, 1977, is arbitrary and capricious in violation of both the Fifth Amendment and the Administrative Procedure Act. See Brief for Appellant at 11-13, 16-17. Apparently not apprised of the constitutional contention, both the Department, see Final Decision, supra note 2, at 12, A.R. 14, and the District Court, compare Complaint (filed May 26, 1981), Barnett v. Weinberger, Civ. No. 81-1211 (D.D.C.) at 8, App. 3, with Barnett v. Weinberger, Civ. No. 81-1211 (D.D.C. Aug. 21, 1981) (judgment), App. 105, resolved the statutory claim adversely to appellant. Because we reverse the judgment of the District Court on other grounds, we do not reach these contentions. For the same reason, we do not pass on other arguments advanced on appeal, namely, that appellant had a contractual right to continuation of Rachael's basic benefits, see Brief for Appellant at 18-20, that the Department's refusal to waive the "custodial care" regulations was arbitrary and capricious, id. at 15-18, and that the District Court erroneously granted the Secretary's motion for a protective order, id. at 14-15
 
 
 [80]
 See, e.g., Medical Services, Uniformed Services Health Benefits Program, Regulation AR 40-121, at 1-2 (Sept. 1970) ("[c]hronically ill patients whose conditions are stabilized but who need medical services to maintain the achieved stability that can be provided safely only by or under the direct supervision of physicians, nurses, or other paramedical personnel ... would not be considered as receiving custodial care") (reiterating position established at Conference, Office of the Surgeon General (Oct. 17, 1967) (memorandum)); Appeal of Alberta Rosen, Office of the Surgeon General 1 (Nov. 9, 1967) (difference between covered medical services and "domiciliary" care defined to be "whether the services of physicians or paramedical personnel are required on the one hand, or whether the patient's needs could be provided for by a non-medical person")
 
 
 [81]
 See, e.g., Medical Services, Uniformed Services Health Benefits Program, Regulation AR 40-121, at 1-2 (Sept. 1970) ("domiciliary or custodial care" exclusion construed to encompass "[t]he type of care designed essentially to assist the individual in meeting his activities of daily living ... and which does not entail or require the continuing attention of trained medical or paramedical personnel") (reiterating position established at Conference, Office of the Surgeon General 1 (Oct. 17, 1967) (memorandum)). Additionally, the Department several times construed the "domiciliary or custodial care" exclusion to encompass only "care which normally is given in the home, nursing home, convalescent home, or similar institutions." CHAMPUS Program Manual, Department of Defense 1.04 (May 1, 1972; accord, Medical Services, Uniformed Services Health Benefits Program, Regulation AR 40-121, at 1 (Feb. 1967). Since usage of this terminology suggests an understanding limiting the exclusion to patient care that realistically might be provided at home or in a residential institution, it constitutes yet another indication that the 1977 regulations represent a substantial departure from prior agency practice
 
 
 [82]
 Batterton v. Francis, supra note 68, 432 U.S. at 424, 97 S.Ct. at 2405, 53 L.Ed.2d at 456; United States v. National Ass'n of Secs. Dealers, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486, 504 (1975); County of Marin v. United States, 356 U.S. 412, 420, 78 S.Ct. 880, 884, 2 L.Ed.2d 879, 885 (1958); Skidmore v. Swift & Co., supra note 74, 323 U.S. at 140, 65 S.Ct. at 164, 89 L.Ed. at 129; Fox v. Standard Oil Co., 294 U.S. 87, 96, 55 S.Ct. 333, 337, 79 L.Ed. 780, 787 (1935); Burnet v. Chicago Portrait Co., supra note 74, 285 U.S. at 16, 52 S.Ct. at 281, 76 L.Ed. at 595; United States v. Missouri P. R.R., supra note 68, 278 U.S. at 280, 49 S.Ct. at 137, 73 L.Ed. at 378
 
 
 [83]
 "We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore v. Swift & Co., supra note 74, 323 U.S. at 140, 65 S.Ct. at 164, 89 L.Ed. at 129 quoted in, General Elec. Co. v. Gilbert, supra note 73, 429 U.S. at 141-142, 97 S.Ct. at 411, 50 L.Ed.2d at 358; accord, Adamo Wrecking Co. v. United States, supra note 68, 434 U.S. at 287 n. 5, 98 S.Ct. at 574 n. 5, 54 L.Ed.2d at 550 n. 5; United States v. Pennsylvania Indus. Chem. Corp., 411 U.S. 655, 674, 93 S.Ct. 1804, 1816, 36 L.Ed.2d 567, 581 (1973); Federal Maritime Bd. v. Isbrandtsen Co., supra note 74, 356 U.S. at 499-500, 78 S.Ct. at 862, 2 L.Ed.2d at 938; see also Batterton v. Francis, supra note 68, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9, 53 L.Ed.2d at 456 n. 9
 
 
 [84]
 Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484, 497 (1978) (deference appropriate when agency interpretation accords with "well-established congressional goals"); Morton v. Ruiz, supra note 74, 415 U.S. at 237, 94 S.Ct. at 1075, 39 L.Ed.2d at 295 ("[i]n order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose"); CBS, Inc. v. Democratic Nat'l Comm., supra note 71, 412 U.S. at 122, 93 S.Ct. at 2096, 36 L.Ed.2d at 794 (court must engage in "careful evaluation of the [agency's] reasoning in light of the policies embodied by Congress in the ... Act"); Zuber v. Allen, supra note 68, 396 U.S. at 192, 90 S.Ct. at 327, 24 L.Ed.2d at 360 (court should defer to agency interpretation only if this position "enhances the general purposes and policies underlying the legislation")
 
 
 [85]
 See 42 Fed.Reg. 17972 (1977)
 
 
 [86]
 The Supreme Court has articulated a similar rationale to reject a statutory construction advanced by an administering agency. See, e.g., SEC v. Sloan, 436 U.S. 103, 117-118, 98 S.Ct. 1702, 1711-1712, 56 L.Ed.2d 148, 160-161 (1978) (spurning agency interpretation by specific reference to agency's failure to explain its position or to address vital issue of statutory authorization); Adamo Wrecking Co. v. United States, supra note 68, 434 U.S. at 287 n. 5, 98 S.Ct. at 574 n. 5, 54 L.Ed.2d at 550 n. 5 (absence of enlightening explanation or careful consideration of statutory authority held to deprive agency interpretation of whatever persuasive power it might otherwise have exerted); Investment Co. Inst. v. Camp, 401 U.S. 617, 627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367, 376 (1971) (declining to defer to agency's position in significant part because agency failed to buttress its interpretation with an opinion or other supportive statement)
 
 
 [87]
 See note 79 supra
 
 
 [88]
 See text supra at note 38; see also text infra at notes 107-112
 
 
 [89]
 Courts have frequently considered whether reenactment of a statute after promulgation of an agency interpretation that is highly publicized or otherwise communicated to Congress may be regarded as ratification by acquiescence. See CBS, Inc. v. FCC, supra note 71, 453 U.S. at 382, 101 S.Ct. at 2823, 69 L.Ed.2d at 720; United States v. Rutherford, supra note 68, 442 U.S. at 554, 99 S.Ct. at 2476, 61 L.Ed.2d at 77-78; National Muffler Dealers Ass'n v. United States, supra note 73, 440 U.S. at 477, 99 S.Ct. at 1307, 59 L.Ed.2d at 525; Red Lion Broadcasting Co. v. FCC, supra note 71, 395 U.S. at 381-382, 89 S.Ct. at 1802, 23 L.Ed.2d at 384; Zemel v. Rusk, 381 U.S. 1, 11-12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179, 187 (1965); Power Reactor Dev. Co. v. International Union of Elec. Workers, supra note 73, 367 U.S. at 408, 81 S.Ct. at 1535, 6 L.Ed.2d at 932; Alstate Constr. Co. v. Durkin, 345 U.S. 13, 16-17, 73 S.Ct. 565, 567-568, 97 L.Ed. 745, 749-750 (1953); Costanzo v. Tillinghast, 287 U.S. 341, 345, 53 S.Ct. 152, 154, 77 L.Ed. 350, 353 (1932). The Secretary, however, has not claimed ratification, nor has he contended that the particular regulations in issue have ever been highly visible or specifically communicated to Congress
 Courts have also indicated that weight may be assigned to agency interpretations when parties reasonably and in good faith have relied upon them to their detriment. See, e.g., National Muffler Dealers Ass'n v. United States, supra note 73, 440 U.S. at 477, 99 S.Ct. at 1307, 59 L.Ed.2d at 525; Udall v. Tallman, supra note 73, 380 U.S. at 18, 85 S.Ct. at 802, 13 L.Ed.2d at 626; Studebaker v. Perry, 184 U.S. 258, 269, 22 S.Ct. 463, 468, 46 L.Ed. 528, 533 (1902). There is no evidence in the instant case that any party has so relied on the regulations' expansive construction of the "domiciliary or custodial care" exclusion. Indeed, if any reliance has occurred, it surely has been on the part of appellant, who represents that he accepted a commission as a regular officer in 1976 to ensure adequate medical care for Rachael under then-applicable CHAMPUS guidelines that were more liberal than at present. See Brief for Appellant at 19.
 
 
 [90]
 SEC v. Sloan, supra note 86, 436 U.S. at 118, 98 S.Ct. at 1712, 56 L.Ed.2d at 161; Piper v. Chris-Craft Indus., Inc., supra note 74, 430 U.S. at 41 n. 27, 97 S.Ct. at 949 n. 27, 51 L.Ed.2d at 153 n. 27; FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745-746, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620, 634 (1973); Zuber v. Allen, supra note 68, 396 U.S. at 193, 90 S.Ct. at 328, 24 L.Ed.2d at 360; Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935-936; 19 L.Ed.2d 1090, 1097-1098 (1968); FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1043, 13 L.Ed.2d 904, 914 (1965); Fox v. Standard Oil Co., supra note 82, 294 U.S. at 97, 55 S.Ct. at 337, 79 L.Ed. at 787
 
 
 [91]
 Nepera Chem., Inc. v. FMC, 213 U.S.App.D.C. 173, 176, 662 F.2d 18, 21 (1981); Austasia Intermodal Lines, Ltd. v. FMC, 188 U.S.App.D.C. 379, 381, 580 F.2d 642, 644 (1978)
 
 
 [92]
 Aero Mayflower Transit Co. v. ICC, 222 U.S.App.D.C. 279, 283-284, 686 F.2d 1, 5-6 (1982)
 
 
 [93]
 See note 83 supra and accompanying text
 
 
 [94]
 Volkswagenwerk Aktiengesellschaft v. FMC, supra note 90, 390 U.S. at 272, 88 S.Ct. at 936, 19 L.Ed.2d at 1098 (quoting American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855, 867 (1965))
 
 
 [95]
 Volkswagenwerk Aktiengesellschaft v. FMC, supra note 90, 390 U.S. at 272, 88 S.Ct. at 936, 19 L.Ed.2d at 1098 (quoting NLRB v. Brown Food Store, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839, 849 (1965))
 
 
 [96]
 Pub.L. No. 569, 70 Stat. 250 (1956) (codified as amended at 10 U.S.C.A. Secs. 1071-1095 (West 1983 & Supp.1986))
 
 
 [97]
 Id., tit. I, Sec. 103(g)(1), 70 Stat. 251. An exclusion for "domiciliary" care may be found in earlier statutes, e.g., Pub.L. No. 51, 57 Stat. 80, Sec. 5 (1943), as well as military regulations, e.g., Department of the Army, Regulation AR 40-506 (Dec. 19, 1952), superseded by id., AR 40-108 (Jan. 13, 1955); Manual of the Medical Department, United States Navy, Art. 21-9(1) (May 20, 1952); Department of the Air Force, Regulation 160-73 (Nov. 6, 1953)
 
 
 [98]
 In 1958, Congress reenacted the Dependents' Medical Care Act and in the process rewrote the exclusion to state that "[h]ospitalization may not be given to dependents for domiciliary care." See Pub.L. No. 85-861, 72 Stat. 1437, 1447 (1958). Congress made clear, however, that this modification wrought no change in the scope of the exclusion. See, e.g., H.R.Rep. No. 930, 85th Cong., 1st Sess. 2 (1957). Indeed, the "domiciliary care" exclusion in the Act was itself no more than a codification of preexisting administrative practice, see S.Rep. No. 1878, supra note 31, at 4, though this practice was by no means uniform, id. at 2
 
 
 [99]
 Pub.L. No. 89-614, 80 Stat. 862 (1966) (codified as amended at 10 U.S.C.A. Secs. 1071-1095 (West 1983 & Supp.1986))
 
 
 [100]
 Id., 80 Stat. 863 (codified as amended at 10 U.S.C. Sec. 1077(b)(1) (1982))
 
 
 [101]
 See text supra at note 54
 
 
 [102]
 10 U.S.C. Sec. 1077(b)(1) (1982)
 
 
 [103]
 See 32 C.F.R. Secs. 199.2(b), 199.4(e)(13) (1986)
 
 
 [104]
 Id., Sec. 199.2(b). The definition states further that "[i]nstitutionalization because of abandonment constitutes domiciliary care." Id
 
 
 [105]
 Illustrations of "domiciliary care" are:
 (A ) Home care is not available. Institutionalization primarily because parents work, or extension of a hospital stay beyond what is medically necessary because the patient lives alone, are examples of domiciliary care provided because there is no other family member or other person available in the home.
 (B ) Home care is not suitable. Institutionalization of a child because a parent (or parents) is an alcoholic who is not responsible enough to care for the child, or because someone in the home has a contagious disease, are examples of domiciliary care being provided because the home setting is unsuitable.
 (C ) Family unwilling to care for a person in the home. A child who is difficult to manage may be placed in an institution, not because institutional care is medically necessary, but because the family does not want to handle him or her in the home. Such institutionalization would represent domiciliary care, that is, the family being unwilling to assume responsibility for the child.
 Id. Sec. 199.4(e)(13)(i)(A-C).
 
 
 [106]
 By definition, "domiciliary care" is inpatient institutional care provided the beneficiary which is not medically necessary. See note 104 supra and accompanying text. This theme is repeated in the explanation of the definition: "Domiciliary care is institutionalization essentially to provide a substitute home--not because it is medically necessary for the beneficiary to be in the institution (although there may be conditions present that have contributed to the fact that domiciliary care is being rendered)...." 32 C.F.R. Sec. 199.4(e)(13)(iii) (1986). It is to be noted that the final agency decision denying basic CHAMPUS benefits to Rachael does not rely upon the "domiciliary care" exclusion, but rather the exclusion pertaining to "custodial care."
 
 
 [107]
 See 10 U.S.C. Sec. 1071 (1982); H.R.Rep. No. 1407, 89th Cong., 2d Sess. 2 (1966); 112 Cong.Rec. 10305 (1966) (statement of Rep. Chamberlain); id. at 10304 (statement of Rep. Talcott); id., at 10298 (statement of Rep. Hebert). A similar concern prompted enactment of the 1956 statute. See, e.g., H.R.Rep. No. 1805, 84th Cong., 2d Sess. 2, 4, 16 (1956); 102 Cong.Rec. 3852-3853 (1956) (statement of Rep. Vinson)
 
 
 [108]
 See, e.g., H.R.Rep. No. 1407, supra note 107, at 2; 112 Cong.Rec. 10304 (1966) (statement of Rep. Dyal); id. (statement of Rep. Talcott); S.Rep. No. 1434, 89th Cong., 2d Sess. 28 (1966), U.S.Code Cong. & Admin.News 1966, p. 3082. (letter from Secretary of Defense to Sen. Humphrey (Mar. 2, 1966)). Enhancement of the attractiveness of a military career was also an objective of the 1956 statute. See, e.g., H.R.Rep. No. 1805, supra note 107, at 3-4, 16; 102 Cong.Rec. 8043 (1956) (statement of Sen. Russell); id. at 8042, 8043 (statement of Sen. Saltonstall); id. at 3853, 3854 (statement of Rep. Van Zandt); id. at 3852, 3853 (statement of Rep. Vinson); id. at 3850 (statement of Rep. Kilday)
 
 
 [109]
 See, e.g., 112 Cong.Rec. 10304 (1966) (statement of Rep. Dyal); id. at 10303 (statement of Rep. Gubser); id. at 10302 (statement of Rep. Pirnie); id. at 10300 (statement of Rep. Hall)
 
 
 [110]
 See, e.g., S.Rep. No. 1434, supra note 108, at 2, 5-6, 11 (1966); H.R.Rep. No. 1407, supra note 107, at 2; 112 Cong.Rec. 10306-10307, 24087 (1966) (statement of Rep. Rivers). Congress adopted the 1966 amendments responsively to its perception that while health benefits extended to non-military federal employees and to wage earners in the private sector had increased significantly during the preceding decade, medical benefits accorded the uniformed services had remained static since enactment of the Dependents' Medical Care Act of 1956. See, e.g., S.Rep. No. 1434, supra note 108, at 5; 112 Cong.Rec. 10299 (1966) (statement of Rep. Bray)
 
 
 [111]
 See, e.g., S.Rep. No. 1434, supra note 108, at 1-2, 6, 11; H.R.Res. 822, 89th Cong., 2d Sess. (1966), reprinted in 112 Cong.Rec. 10297 (1966); H.R.Rep. No. 1407, supra note 107, at 1-2; 112 Cong.Rec. 24087 (1966) (statement of Rep. Rivers); id. at 18974 (statement of Sen. Yarborough); id. at 18970 (statement of Sen. Symington); id. at 10306 (statement of Rep. Rivers); id. at 10305 (statement of Rep. Chamberlain); id. at 10304 (statement of Rep. Dyal); id. at 10304 (statement of Rep. Talcott); id. at 10300 (statement of Rep. Bennett); id. at 10298 (statement of Rep. Hebert); id. at 10297 (statement of Rep. Smith); Military Medical Benefits: Hearings Before a Subcomm. of the Comm. on Armed Services, 89th Cong., 2d Sess. 16 (1966) (statement of Sen. Robert Kennedy)
 
 
 [112]
 See 112 Cong.Rec. 10305 (1966) (statement of Rep. Chamberlain) ("[n]o benefit which now exists is taken away from dependents"); id. at 10302 (statement of Rep. Hebert) ("[t]he whole purpose of the bill is to upgrade and not downgrade the benefits given to the man in uniform")
 
 
 [113]
 H.R.Rep. No. 1407, supra note 107, at 16
 
 
 [114]
 See notes 96-100 supra and accompanying text
 
 
 [115]
 See notes 104-106 supra and accompanying text
 
 
 [116]
 S.Rep. No. 1434, supra note 108, at 17, U.S.Code Cong. & Admin.News 1966, p. 3096
 
 
 [117]
 102 Cong.Rec. 3853 (1956) (statement of Rep. Van Zandt) (emphasis added)
 
 
 [118]
 Id. at 3854 (statement of Rep. Van Zandt) (emphasis added). Representative Vinson made remarks of similar tenor, stating that the 1966 proposed legislation would "secure proper medical treatment for [a military man's] wife and children when they need it," id. at 3852 (emphasis added), and punctuating this observation with the following illustration:
 When crew members in the Strategic Air Command go to a forward base overseas for extended operations they can be certain under this bill that their wives and children are going to get medical attention if they need it.
 Id. (emphasis added).
 
 
 [119]
 112 Cong.Rec. 10302 (1966) (statement of Rep. Pirnie) (emphasis added)
 
 
 [120]
 Id. at 10305 (statement of Rep. Chamberlain) (emphasis added)
 
 
 [121]
 See e.g., S.Rep. No. 1434, supra note 108, at 7, 9, 10-11, 12, 14, 16 (1966), U.S.Code Cong. & Admin.News 1966, pp. 3088-3090, 3093, 3095; 112 Cong.Rec. 24087 (1966) (statement of Rep. Rivers). These remarks were not tied to any particular statutory feature, but they point unerringly to a major circumscription in the exclusion of "domiciliary or custodial care." We note additionally that the exclusion was similarly characterized in congressional hearings prior to passage of the 1956 Act and the 1966 amendments. See Hearings on Military Medical Benefits as Proposed in H.R. 9271, H.R. 13582, and H.R. 13583 Before Subcomm. No. 2 of the House Comm. on Armed Services, 89th Cong., 2d Sess. 5908 (1966) (definition of "domiciliary care" as "care normally provided in an institution such as a nursing or convalescence home") (statement of Robert Gettings, as prepared by Helen B. Holodnak, National Association for Retarded Children); Dependents' Medical Care Hearings Before the Senate Comm. on Armed Services, 84th Cong., 2d Sess. 32 (1956) (reference to "domiciliary care" as "domiciliary care for the aged") (statement of Commander Frank Slatinshek, United States Naval Reserve, Member, Military Career Task Force); id. at 38 (definition of "domiciliary type cases" as "cases which require simple nursing care") (statement of Captain David L. Martineau, Bureau of Naval Personnel, Department of Navy); id. at 104, 110 (definition of "domiciliary care" as care provided in "nursing" or "convalescent" homes) (statement of Steven D. Williams, Second Vice President of the Connecticut General Life Insurance Co. of Hartford, Connecticut). The Department itself, further, has used this terminology to describe the current "domiciliary or custodial care" exclusion, see notes 80-81 supra and accompanying text, as well as the "domiciliary care" exclusion in the 1956 Act, see, e.g., Medical Service, Dependents' Medical Care, Regulation AR 40-121, at 4 (July, 1964); Department of Defense Directive, Dependents' Medical Care 3 (Oct. 18, 1956 & Apr. 25, 1962); Department of Defense Directive, Medical and Dental Care for Dependents of Members of the Armed Forces 5 (Dec. 12, 1954)
 
 
 [122]
 S.Rep. No. 1434, supra note 108, at 10; accord, id. at 16 ("[c]onvalescent and nursing home care ... is generally not considered to be hospital care within its strict meaning")
 
 
 [123]
 With the exception of an opinion by the United States Court of Claims, Prindle v. United States, 5 Cl.Ct. 493 (1984), we are unaware of any decision even obliquely addressing the proper scope of the CHAMPUS domiciliary and custodial exclusion. The Prindle court relied upon this exclusion to deny repayment of costs incurred by a retired naval officer in a nursing facility. That decision rested on factual predicates that apparently did not include any medically-necessary care
 
 
 [124]
 See 42 U.S.C. Sec. 1395y(a)(9) (1982)
 
 
 [125]
 E.g., Kuebler v. Secretary of HHS, 579 F.Supp. 1436, 1438 (E.D.N.Y.1984); see also Hayner v. Weinberger, 382 F.Supp. 762, 766 (E.D.N.Y.1974) (custodial care "has been interpreted to connote a level of routine maintenance or supportive care which need not be provided in an institutional setting by skilled professional personnel"); Reading v. Richardson, 339 F.Supp. 295, 300-301 (E.D.Mo.1972)
 
 
 [126]
 345 F.Supp. 983 (D.Md.1972), aff'd, 475 F.2d 1222 (4th Cir.1973)
 
 
 [127]
 Id. at 993
 
 
 [128]
 Id. at 990
 
 
 [129]
 See cases cited infra note 142
 
 
 [130]
 Lord v. Richardson, 356 F.Supp. 232, 234 (S.D.Ind.1972)
 
 
 [131]
 Samuels v. Weinberger, 379 F.Supp. 120, 123 (S.D.Ohio 1973)
 
 
 [132]
 Supra note 2
 
 
 [133]
 Final Decision, supra note 2, at 1, A.R. 58 (emphasis added)
 
 
 [134]
 Id. at 9, A.R. 67 (emphasis added)
 
 
 [135]
 Indeed, further extension of the perverse logic advanced by the Department would reveal that the more debilitating the ailment affecting a claimant, the more likely the care will be termed "custodial," since even the simplest bodily tasks will require assistance and supervision
 
 
 [136]
 Supra note 125
 
 
 [137]
 579 F.Supp. at 1439
 
 
 [138]
 Id. The court also observed that "although taken singly [the patient's] ailments might not seem to require skilled nursing care, taken together they made her a chronically ill, disabled old woman in need of monitoring and care by skilled personnel in order to maintain what health she had left and prevent any further injury." Id. at 1439-1440
 
 
 [139]
 319 F.Supp. 689 (D.S.C.1970)
 
 
 [140]
 Id. at 691. The government further argued that included care contemplated "health services which can only be provided in an institutional setting by trained and skilled professional personnel." Id
 
 
 [141]
 Id. at 690-691
 
 
 [142]
 Id. at 691-692; see also Breeden v. Weinberger, 377 F.Supp. 734, 737 (M.D.La.1974); Reading v. Richardson, supra note 125, 339 F.Supp. at 300; Samuels v. Weinberger, 379 F.Supp. 120, 123 (S.D.Ohio 1973); Klofta v. Mathews, 418 F.Supp. 1139, 1142-1143 (E.D.Wis.1976); Schoultz v. Weinberger, 375 F.Supp. 929, 932 (E.D.Wis.1974)
 
 
 [143]
 Sowell v. Richardson, supra note 139, 319 F.Supp. at 692
 
 
 [144]
 Kuebler v. Secretary of HHS, supra note 125, 579 F.Supp. at 1439
 
 
 [145]
 Lord v. Richardson, supra note 130, 356 F.Supp. at 234
 
 
 [146]
 See Second Recommended Decision, supra note 25, at 2, 5, A.R. 19, 22
 
 
 [147]
 See Final Decision, supra note 2, at 5-8, 9, App. 62-66, 67
 
 
 [148]
 5 U.S.C. Sec. 706(2)(A) (1982). The substantial-evidence rule does not govern per se since Congress has not imposed a requirement that adjudications of claims for CHAMPUS benefits be made or reviewed on the record of a hearing provided by statute. See id. Sec. 706(2)(E); see also id. Secs. 554(a), 556, 557; Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 622-623 n. 19, 93 S.Ct. 2469, 2479-2480 n. 19, 37 L.Ed.2d 207, 219 n. 19 (1973); Camp v. Pitts, 411 U.S. 138, 140-141, 93 S.Ct. 1241, 1243-1244, 36 L.Ed.2d 106, 110-111 (1973) (per curiam); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414-415, 91 S.Ct. 814, 822-823, 28 L.Ed.2d 136, 151-152 (1971); Association of Data Processing Orgs. v. Board of Governors of Fed. Reserve Sys., 240 U.S.App.D.C. 301, 307, 308, 745 F.2d 677, 683, 684 (1984). We have recognized, however, that there is little practical difference between the substantial-evidence and the arbitrary-or-capricious tests. Association of Data Processing Orgs. v. Board of Governors of Fed. Reserve Sys., supra, 240 U.S.App.D.C. at 308, 745 F.2d at 684; Lead Indus. Ass'n v. EPA, 208 U.S.App.D.C. 1, 17 n. 29, 647 F.2d 1130, 1146 n. 29 (1980); Pacific Legal Found. v. Department of Transp., 193 U.S.App.D.C. 184, 189 n. 35, 593 F.2d 1338, 1343 n. 35, cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979); American Pub. Gas Ass'n v. FPC, 186 U.S.App.D.C. 23, 35-36, 567 F.2d 1016, 1028-1029 (1977)
 
 
 [149]
 Motor Vehicle Mfrs. Ass'n v. Ruckelshaus, 231 U.S.App.D.C. 240, 245, 719 F.2d 1159, 1164 (1983); Sierra Club v. Costle, 211 U.S.App.D.C. 336, 361 n. 67, 657 F.2d 298, 323 n. 67 (1981)